MARION DILDAY, BERL B. RESPESS AND ROBERT E. MOORE v. BEAUFORT COUNTY BOARD OF EDUCATION, A BODY CORPORATE, AND THE INDIVIDUAL MEMBERS THEREOF, W. B. VOLIVA, CHAIRMAN; RALPH HODGES, JR., JASPER WARREN, CARMER WALLACE, W. L. GUILFORD; W. F. VEASEY, SECRETARY, AND BEAUFORT COUNTY COMMISSIONERS, CONSISTING OF SAM MOORE, CHAIRMAN; CECIL LILLEY, JAKE VAN GYZEN, ALTON CLAYTON, WALTON BROOME; AND JAY M. HODGES, BEAUFORT COUNTY TREASURER AND AUDITOR.

(Filed 16 June, 1966.)

**1. Appeal and Error § 21—**
    An appeal is in itself an exception to the judgment and raises the question whether the facts support the judgment.

**2. Appeal and Error § 19—**

An exception which appears for the first time in an assignment of error is ineffectual.

**3. Appeal and Error § 50—**

On appeal from the dissolution of a temporary restraining order, the Supreme Court may review the findings of fact as well as the conclusions of law, and to that end may find the facts necessary for a determination of whether the lower court erred in dissolving the temporary order.

**4. Schools § 4—**

While order for the consolidation of schools in a district may not be made until after a public hearing, G.S. 115-76(1), where it appears that the State Board of Education approved the original plans for consolidation prior to the public hearing on the revised plans, and that its Assistant Superintendent stated that no further action by the State Board was necessary, but that thereafter the State Board formally approved the revised plans for consolidation ordered by the county board of education after the public hearing, there is a sufficient compliance with the statute.

**5. Schools § 4—**

It is the duty of the county board of education to determine, in the first instance, what repairs, remodeling, or enlarging and construction of school houses are required, and the courts may not interfere with its discretionary determination of these questions in the absence of manifest abuse of discretion or a disregard of law, G.S. 115-35, G.S. 115-29; it is the duty of the board of county commissioners to determine what proposals presented to it by resolution of the county board of education are necessary and possible, but having determined this question and having provided funds, the jurisdiction of the county commissioners ends and the authority to execute the plans is in the board of education.

**6. Same—**

County boards of education with the approval of the county commissioners have authority to transfer or reallocate funds from one project to another within the general purpose of a bond resolution and referendum, but in order to do so the board of education must, by resolution, request such reallocation and apprise the county commissioners of the conditions necessitating the transfer, and the board of county commissioners must make an investigation and record their findings upon their official minutes, and authorize or reject the proposed reallocation; when the county commissioners make only a verbal approval of the reallocation, the expenditure of funds for the revised plans should be enjoined until the statutory requirements are complied with.

**7. Taxation § 12—**

Where a bond resolution and referendum relating to the consolidation of three high schools attended exclusively by white pupils is approved by the voters prior to the enactment of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000c et seq., the county board of education and board of county commissioners have authority to take funds allocated for the improvement of Negro high schools in the district and add them to the allocation for the consolidated high school so as to constitute the consolidated school one for all of the high school pupils of the district, and thus integrate the high school in conformity with Federal requirements, the reallo-

cation being for a project within the general purpose for which the bonds were authorized.

**8. Schools § 4—**

A county board of education or a board of county commissioners is without power to provide their constitutents with racially segregated schools; even though the effect of Title VI of the Civil Rights Act of 1964 is merely to deprive a segregated school of Federal aid, Title IV of the Act authorizes the Attorney General, upon complaint, to enforce integration by legal proceedings.

**9. Constitutional Law § 1—**

The Constitution of the United States takes precedence over the Constitution of North Carolina, and, for all practical purposes, the Federal Constitution means what the Supreme Court of the United States says it means.

**10. Schools § 1—**

An adequate system of public education is the basis of a viable democratic government.

MOORE, J., not sitting.

LAKE, J., concurring.

APPEAL by plaintiffs from *Mintz, J.,* May 2, 1966 Civil Session of BEAUFORT.

Plaintiffs, as citizens and taxpayers of Beaufort County, brought this action on April 22, 1966, (1) to restrain defendant Beaufort County Board of Education (School Board), from expending any money of Beaufort County for the purpose of constructing a centrally located building to consolidate and house the student bodies of the John A. Wilkinson High School, Bath High School, Pantego High School, Belhaven High School, and Beaufort County High School — all the high schools in District III; and (2) to restrain defendant Beaufort County Commissioners (Commissioners), and defendant Jay M. Hodges, treasurer and auditor of Beaufort County, from providing defendant School Board with any money for the purpose of constructing the said high school. A temporary restraining order was issued on April 22, 1966, by his Honor, Joseph W. Parker, who made it returnable before the judge presiding at the May 1966 Session. At that time, Judge Mintz heard the matter upon the verified complaint and the affidavit of W. F. Veasey, superintendent of Beaufort County Schools and secretary to defendant School Board, which affidavit incorporated the pertinent ordinance and resolutions. No answers have been filed, and the record consists of the affidavits and the court's orders. The briefs and oral

arguments disclose no dispute with reference to the facts. Those pertinent to this controversy are stated chronologically:

In May 1960, defendant School Board and the Board of Education for the Washington City School Administrative Unit jointly requested the Division of School Planning of the State Department of Public Instruction to survey all the schools in Beaufort County and to make long-range recommendations for the improvement of the two school systems. In consequence, a survey committee was commissioned. It made its report on October 22, 1962, and, *inter alia,* recommended that immediate steps be taken to build a consolidated high school on the north side of the Pamlico River, *i.e.,* in District III. On April 14, 1964, defendant School Board and the Washington City Board passed a joint resolution requesting defendant Commissioners to authorize a bond issue in the amount of $1,400,000.00 for school construction, 52.96% to be allotted to the County Administrative Unit and the remaining 47.04% to the Washington City Administrative Unit. These percentages corresponded to the number of students in the two units. Pursuant to the request of the two School Boards, at the meeting of defendant Commissioners, on September 8, 1964, a bond order was introduced authorizing the bond issue requested. At the same meeting defendant Commissioners scheduled a public hearing on the bond issue for September 22, 1964.

On September 11, 1964, defendant School Board adopted a resolution showing the "allocation of funds for school building projects" which it would make if the Beaufort County bond order and the State bond issue (authorized by Pub. L. 1963, ch. 1079), were approved by the voters. The proposed allocations were:

| | |
|---|---:|
| "Central High School on the North side of the River | $ 780,000.00 |
| Aurora High School, dressing and shower rooms for gym | 25,000.00 |
| John A. Wilkinson School, physical education building | 50,000.00 |
| Bath High School, modernizing lunchroom | 20,855.66 |
| Chocowinity Elementary School, two classrooms, principal's office, clinic room, teachers' restroom and an all purpose room to serve as lunchroom and auditorium | 56,000.00 |
| Beaufort County High School, four classrooms, gymtorium, vocational shop | 105,000.00 |

| | |
|---|---:|
| Belhaven High School, four class-rooms and assembly room | 90,000.00 |
| S. W. Snowden High School, four classrooms, lunchroom, vocational shop | 70,000.00 |
| Equipment for above listed new buildings | 20,000.00 |
| GRAND TOTAL | $1,216,855.66 |
| Source of Funds: | |
| County schools' share of County bond funds | $ 741,580.00 |
| County schools' share of State bond funds | 475,275.66 |
| TOTAL | $1,216,855.66" |

At that time, as now, the Pantego High School, the Bath High School, and the Wilkinson High School of Belhaven served white children only; the Beaufort County High School at Pantego and the Belhaven High School served Negro children exclusively. Defendants, in their brief, concede that the preelection publicity indicated that the allocation of $780,000.00 for "Central High School on the north side of the river" was for a consolidated high school which would house only white students from the Pantego, Bath, and Wilkinson high schools.

At the public hearing on September 22, 1964, the allocation of funds made by defendant School Board on September 11th was publicized, explained, and debated. Following the hearing, defendant Commissioners enacted the bond order authorizing the issuance of school bonds in the amount of $1,400,000.00, pursuant to the County Finance Act. The order stated the objects for which the bonds were to be issued as follows:

"SECTION 1. The Board of Commissioners of the County of Beaufort has ascertained and hereby determines that it is necessary to erect in the Beaufort County Administrative Unit and in the Washington City School Administrative Unit, several new buildings to be used as school houses, school garages, physical education and vocational education buildings, lunchrooms and other school plant facilities, and to reconstruct and enlarge, by the erection of additions, several existing buildings located in such Units and used for such purposes, and to acquire land and furnishings and equipment necessary for such new or reconstructed or enlarged buildings, in order to enable the County of Beaufort as an administrative agency of the public school system of the State of North Carolina, to main-

tain public schools in said school administrative units for the nine months' school term prescribed by law, and that it will be necessary to expend for such purposes not less than $1,400,000 in addition to other moneys which have been made available therefor."

Section 3 of the order allotted $741,580.00 to the Beaufort County School Administrative Unit and $658,420.00 to the Washington City School Administrative Unit. Notice of the bond order and the election to be held on November 3, 1964 (the same day as the referendum on the State bond election), were thereafter duly published. In an effort to secure the voters' approval of the bonds, prior to November 3rd, defendant School Board "distributed to interested citizens" a mimeographed bulletin containing, *inter alia,* the allocation made by it on September 11, 1964. The bulletin also contained questions and answers of interest to the taxpayers, one of which was:

"Q. If the Bath, John A. Wilkinson, and Pantego High Schools are consolidated, will the present school building facilities and equipment in those schools continue to be used?

A. Yes. Each school will remain an elementary school and have grades from one through eight in it. There will be a principal of each school who can devote his entire leadership and professional talent to the improvement of instruction in the elementary grades."

Defendant School Board likewise caused the publication of sample ballots, and urged the electorate to vote YES for both the state and county bond issues. The ballot for the county bond issue was phrased in the same general language of the bond order.

In the referendum, both state and county bond issues were approved by a better than three-to-one majority of the votes cast.

On July 2, 1964, the Federal Civil Rights Act of 1964 became law. Title VI of the Act (78 Stat. 252, 42 U.S.C.A. §§ 2000d through 2000d-4) authorizes and directs each Federal agency empowered to extend financial assistance to any program or activity to issue rules, regulations or orders of general application, to the end that no persons "be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance," on the ground of race, color, or national origin. Compliance with such rules and regulations "may be effected (1) by the termination of or refusal to grant or to continue assistance under such program . . . or (2) by any other means authorized by law."

On April 20, 1965, defendant School Board, in an official session, adopted a plan for compliance with Title VI of the Act. The plan contained, *inter alia,* the following:

"DISTRICT III.

A central consolidated high school plant will be constructed in the approximate geographic center of this district . . . and all high school children therein will be assigned to this high school for the 1966-67 school year and each year thereafter. An appropriation has been made for the construction of this high school plant."

This plan departed from the pre-referendum allocation of September 11, 1964, in that, instead of consolidating only the three white high schools, it proposed to consolidate all of the five high schools in District III into one central high school for the children of both races. In an official session on August 24, 1965, the School Board unanimously resolved:

"That the $105,000.00 allocated for additional construction at the Beaufort County High School and the $90,000.00 allocated to build additional facilities at the Belhaven High School be added to the allocation of the $780,000.00 previously planned for the construction for the central consolidated high school."

The State Board of Education, on November 4, 1965, approved defendant School Board's "School Improvement Program," which included the consolidation of all five high schools in District III.

On January 5, 1966, defendant School Board, in compliance with G.S. 115-76, conducted a public hearing on the proposal to consolidate the five high schools. Present at the hearing as a representative of the State Board of Education was Dr. J. L. Pierce, Director of the Division of School Planning. The next day, the superintendent of the Beaufort County Schools requested the State Board of Education to join the County Board in approving the proposed consolidation. He was informed by the Assistant Superintendent of the State Department of Public Instruction that the State Board, at its meeting on November 4, 1965, had approved the long-range plan for the consolidation of these high schools as proposed by the Beaufort County Board of Education and recommended by the State Review Panel, and that no further action was necessary.

On February 9, 1966, defendant School Board enacted and submitted to defendant Commissioners a resolution requesting their approval of the plan to omit the improvements originally intended for the Beaufort County and Belhaven high schools and to use these

funds to finance an enlarged Central High School with a capacity of 900 pupils instead of 600. With reference to this request, the complaint alleges "that the Board of County Commissioners refused to endorse the revision as requested by the defendant Board of Education and took no action whatever on the request." In his judgment, Judge Mintz found as a fact that defendant Commissioners "in session on March 7, 1966, upon the counsel of Mr. L. H. Ross, informed the Board of Education that the bond order for the County School Bond Funds has sufficient latitude to enable the Board of Education to apply the funds to School building construction according to needs."

On March 8, 1966, defendant School Board unanimously adopted a resolution which recited that the original plan to consolidate only the Bath, Wilkinson, and Pantego high schools had to be abandoned when the School Board was required to make a plan for compliance with Title VI of the Civil Rights Act of 1964; that compliance with the Act required the consolidation of all five high schools in District III, and necessitated the transfer of the funds previously earmarked for Beaufort County High School and Belhaven High School to the Central High School project; that the State Board of Education had approved the building plans for the Central High School; that, at the public hearing on January 5, 1966, "the objections presented were not sufficiently valid to alter or change the plan for the Central High School"; that the office of the Attorney General had advised the School Board that compliance with the Civil Rights Act is necessary to qualify the Beaufort County School Administrative Unit for the receipt of $475,275.66, Beaufort County's share of the State school bond funds; and that defendant Commissioners, upon the advice of the county attorney, had advised the School Board that the bond order gave it sufficient latitude to enable it to apply the funds to school building construction according to needs. Upon these recitals, the School Board resolved to proceed immediately with the "construction of a central high school on the site already purchased in the Yeatesville area for a high school plant of 900 or more students to replace the Bath High School, Beaufort County High School, Belhaven High School, John A. Wilkinson High School, and Pantego High School."

In June 1965, defendant Commissioners borrowed $400,000.00 upon bond anticipation notes, and this sum has been expended for "purposes authorized in the bond issue," including $35,000.00 for a site for the construction of Central High School. Plaintiffs alleged that, in June 1966, defendants plan to borrow $500,000 more on bond anticipation notes and, with the money, to begin the con-

struction of a central high school plant to house children from the five schools of District III.

At the termination of the hearing before him, Judge Mintz found facts which, insofar as they went, are consistent with the above statement. He concluded as a matter of law that the referendum was in all respects regular and valid, and that the construction of the planned Central High School to replace the five schools is proper and valid. He entered judgment dissolving the injunction, and plaintiffs appealed.

*John A. Wilkinson for plaintiff appellants.*

*William P. Mayo for Beaufort County Board of Education, defendant appellee.*

*L. H. Ross for Beaufort County Commissioners and Jay M. Hodges, Beaufort County Treasurer and Auditor, defendant appellees.*

SHARP, J. Plaintiffs' case on appeal contains no exceptions. The appeal, however, is an exception to the judgment, and raises the question whether the facts found support it. *Cratch v. Taylor,* 256 N.C. 462, 124 S.E. 2d 124. Exceptions to the failure of the judge to make certain detailed findings with reference to preelection publicity given the bond referendum by defendant School Board — as well as a statement of the findings allegedly requested — appear for the first time in the first assignment of error. Such an exception, as we have repeatedly pointed out, is worthless. *Holden v. Holden,* 245 N.C. 1, 95 S.E. 2d 118; 1 Strong, N. C. Index, Appeal and Error § 19 (1957).

Since this case affects the public interest, we advanced it upon our calendar under Rule 13, at the request of the parties. In order that our purpose in doing so be not defeated, we must, in spite of a poor record, consider whether the court below erred in dissolving the preliminary injunction. To that end, we find the facts to be as set out in our preceding statement. "Upon an appeal from an order granting or refusing an interlocutory injunction, the findings of fact, as well as the conclusions of law, are reviewable by this Court." *Deal v. Sanitary District,* 245 N.C. 74, 76-77, 95 S.E. 2d 362, 364. *Accord, Coffee Co. v. Thompson,* 248 N.C. 207, 102 S.E. 2d 783; *Clinard v. Lambeth,* 234 N.C. 410, 67 S.E. 2d 452.

Plaintiffs, as counsel emphasized upon the argument, do not attack the validity of the bonds which defendant Commissioners have heretofore issued, or which they may hereafter issue, pursuant to the bond ordinance approved at the November 3, 1964 election. They do, however, deny the authority of defendants to expend any of the

proceeds from the bonds for the purpose of consolidating the Beaufort County and Belhaven high schools with the Bath, Pantego, and Wilkinson high schools. Plaintiffs' contentions are these:

(1)  There has been no valid order of consolidation. Under G.S. 115-76(1), concurrent action by the County Board of Education and the State Board of Education *after* the required public hearing is essential in order to consolidate any two high schools with an average daily attendance of 60 or more pupils. The State Board approved the consolidation of the five schools in question on November 4, 1965 — two months *in advance* of the public hearing on January 5, 1966. After the public hearing, an order of consolidation made by the County Board alone was ineffectual.

(2)  Defendant Boards are without authority to divert to Central High School funds allotted to the Beaufort County and Belhaven high schools prior to the bond referendum.

(3)  Even if defendant Boards are legally empowered to transfer the funds in question from one educational purpose to another, unilateral action by defendant School Board cannot effect the transfer, since such a reallocation requires certain specific findings and the approval by defendant Commissioners. These findings have not been made nor has approval been given in the manner required by law.

Plaintiffs' first contention, originally valid, is now moot. It appears from a stipulation signed by counsel for all parties and filed with this Court on June 13, 1966, that at its meeting on May 6, 1966, the State Board of Education formally approved the consolidation of the five high schools in District III into one central high school by the following resolution:

"The Superintendent of Beaufort County Board of Education having communicated with the Secretary of the State Board of Education relative to the questions raised regarding the action of the State Board of Education upon the proposed long-range building plans of Beaufort County, and it appearing to the Board that a public hearing has heretofore been held by the Beaufort County Board of Education, at which the State Board of Education was represented as required by G.S. 115-76; and it further appearing to the Board that the Beaufort County Board of Education has approved the plans for consolidation of the proposed schools in Beaufort County, and the State Board of Education upon considering the same finds that the proposed long-range building plan will promote and enhance educational advantages in the proposed area to be consolidated: Thereupon, the State Board of Education con-

curs with the Beaufort County Board of Education and approves the plans for the consolidation of high schools at Bath, Beaufort County, Belhaven, J. A. Wilkinson, and Pantego into one consolidated high school as described in the long-range plan submitted to the Board, this action to be effective as of January 6, 1966."

This action by the State Board related back to January 6, 1966, and constitutes a sufficient compliance with G.S. 115-76(1). *Burney v. Comrs.*, 184 N.C. 274, 114 S.E. 298.

Plaintiffs' second and third contentions require a consideration of the relative duties of county commissioners and county boards of education with reference to the public schools.

The authority and duty to operate county schools is vested in the county board of education, which is required to provide adequate school buildings, suitably equipped. G.S. 115-35; G.S. 115-29. The board of education determines, in the first instance, what buildings require repairs, remodeling, or enlarging; whether new school houses are needed; and if so, where they shall be located. Such decisions are vested in the sound discretion of the board of education, and its actions with reference thereto cannot be restrained by the courts absent a manifest abuse of discretion or a disregard of law. *Feezor v. Siceloff*, 232 N.C. 563, 61 S.E. 2d 714; *Board of Education v. Lewis*, 231 N.C. 661, 58 S.E. 2d 725; *Waldrop v. Hodges*, 230 N.C. 370, 53 S.E. 2d 263; *Atkins v. McAden*, 229 N.C. 752, 51 S.E. 2d 484.

Each year the board of education surveys the needs of its school system with reference to buildings and equipment. By resolution it presents these needs, together with their costs, to the commissioners, who are "given a reasonable time to provide the funds which they, upon investigation, shall find to be necessary for providing their respective units with buildings suitably equipped. . . ." G.S. 115-129. It is the board of commissioners, therefore, which is charged with the duty of determining what expenditures shall be made for the erection, repairs, and equipment of school buildings in the county. *Johnson v. Marrow*, 228 N.C. 58, 44 S.E. 2d 468. However, as pointed out in *Atkins v. McAden, supra*, the commissioners' control over the expenditure of funds for the erection, repair, and equipment of school buildings does not interfere with the exclusive control of the schools which is vested in the county board of education or in the trustees of administrative units. Having determined what expenditures are necessary and possible, and having provided the funds, the jurisdiction of the commissioners ends. The

authority to execute the plans is in the board of education. *Parker v. Anson County,* 237 N.C. 78, 74 S.E. 2d 338.

This dual responsibility obviously requires the utmost cooperation between the two boards and the full assumption of responsibility by each, if the educational needs of the children of the county are to be met.

G.S. 153-107 provides, *inter alia,* that "the proceeds of the sale of bonds and bond anticipation notes . . . shall be used only for the purposes specified in the order authorizing said bonds, and for the payment of the principal and interest of such notes issued in anticipation of the sale of bonds. . . ." In construing this section, this Court has said:

> "But G.S. 153-107, in our opinion, does not place a limitation upon the legal right to transfer or allocate funds from one project to another within the general purpose for which bonds were issued. The inhibition contained in the statute is to prevent funds obtained for one general purpose being transferred and used for another general purpose. For example, the statute prohibits the use of funds derived from the sale of bonds to erect, repair and equip school buildings, from being used to erect or repair a courthouse, or a county home, or similar project." *Atkins v. McAden, supra* at 756, 51 S.E. 2d at 487.

To effectuate such a transfer of funds from one project to another, however, certain facts must appear, and certain preliminary steps must be taken.

1. The board of education must, by resolution, request the reallocation of funds and apprise the county commissioners of the conditions which bring about the needs for the transfer.

2. The commissioners must then investigate the facts upon which the School Board's request is made.

3. After making their investigation, the commissioners must, by resolution, record their findings upon their official minutes and authorize or reject the proposed reallocation of funds.

If the commissioners find (1) that, since the bonds were authorized, conditions have so changed that the funds are no longer necessary for the original purpose, or that the proposed new project will eliminate the necessity for the originally-contemplated expenditure and better serve the educational interests of the district involved, or that the law will not permit the original purpose to be accomplished in the manner intended, and (2) that the total proposed expenditure for the changed purpose is not excessive, but is necessary in order to maintain the constitutional school term, the

commissioners may then legally reallocate the funds in accordance with the request from the board of education. Without such affirmative findings, however, the commissioners have no authority to transfer funds previously allocated to another purpose. And, without authority from the commissioners, the county board of education itself has no power to reallocate the funds. *Parker v. Anson County, supra; Mauldin v. McAden,* 234 N.C. 501, 67 S.E. 2d 647; *Gore v. Columbus County,* 232 N.C. 636, 61 S.E. 2d 890; *Feezor v. Siceloff, supra; Waldrop v. Hodges, supra; Atkins v. McAden, supra.*

Here, defendant School Board has strictly followed the appropriate procedures in requesting the reallocation of the funds in question. However, when it requested defendant Commissioners' approval of the transfer to Central High School of funds which had been allotted to the Beaufort County and Belhaven high schools, the Commissioners — without taking any official action and without making any entry whatever upon their minutes — orally advised the Board of Education (through the county attorney) that "the bond order for the county school bond funds has sufficient latitude to enable the Board of Education to apply the funds to school building construction according to needs."

The transfer which the School Board has requested involves no change in the purpose for which the school bonds were issued, *i.e.,* "to enable the County of Beaufort as an administrative agency of the public school system of North Carolina to maintain public schools in said administrative unit for the nine months' school term prescribed by law." It does, however, involve a change in the method of accomplishing that purpose. *Feezor v. Siceloff, supra. Prima facie,* the requested transfer would be entirely legal under ordinary circumstances, for it would seem that if the high school children from the Beaufort County and the Belhaven high schools are transferred to Central High School, the necessity for the expenditures originally proposed for these two schools will be totally eliminated, or reduced to such an extent that the expenditure originally contemplated could not be justified. Defendant Boards, however, are not faced with ordinary circumstances. Even if some of the needs at the Beaufort County and Belhaven schools should still remain after the transfer of their high school students to a centrally-located, consolidated high school, so also would the illegality of the original plan to make Central High School a segregated school for white children.

If the Commissioners approve the School Board's request for a transfer of funds, plaintiffs do not suggest that the voters of Beaufort County will have been dealt with unfairly in that tax funds

are being misspent or diverted *from educational purposes.* They do assert, however, that the people voted bonds for Central High School believing that it would be a consolidated school for white children only. Defendants do not contest this assertion, and we assume its truth. But notwithstanding that belief, it is not within the power of the Board of Education or the Board of Commissioners of Beaufort County to provide their constituents with racially segregated schools. The provision of Section 2, Article 9 of the Constitution of North Carolina which provided that "the children of the white race and the children of the colored race shall be taught in separate public schools" was invalidated on May 17, 1954, when the Supreme Court of the United States handed down its decision in *Brown v. Board of Education of Topeka,* 347 U.S. 483, 98 L. Ed. 873, 74 S. Ct. 686, 38 A.L.R. 2d 1180. The Constitution of the United States takes precedence over the Constitution of North Carolina, and, for all practical purposes, the Federal Constitution means what the Supreme Court of the United States says it means. It boots little that the members of the Board of County Commissioners, the Board of Education, and the majority of their constituents share the conviction that the *Brown* case did violence to the Constitution as it was understood by its authors and by those who ratified it. The *Brown* case is binding upon us. *Constantian v. Anson County,* 244 N.C. 221, 93 S.E. 2d 163. Furthermore, Title VI of the Civil Rights Act of 1964 provides that the Federal department or agency which is empowered to extend Federal financial assistance to any program is *directed* to effectuate the provisions of the Act "by issuing rules, regulations, or orders of general applicability which shall be consistent with achievement of the objectives of the statute authorizing the financial assistance in connection with which the action is taken." Translated, this simply means that if Beaufort County is to secure any Federal aid to education, it must comply with Federal law.

Title VI of the Civil Rights Act refers only to federally-assisted programs and, where no Federal grants are in contemplation, need not be considered. A refusal to accept Federal aid, however, will not solve the basic problem in this case. Title IV of the Civil Rights Act of 1964 (78 Stat. 246, 42 U.S.C.A. §§ 2000c through 2000c-9), entitled "Public Education," authorizes the Attorney General of the United States, upon a written complaint by any parent or group of parents that his or their minor children, as members of a class of persons similarly situated, are being deprived by a school board of the equal protection of the laws, "to initiate and maintain appropriate legal proceedings for relief" in a district court of the United

States, to the end "that the institution of an action will materially further the orderly achievement of desegregation in public education."

Obviously, plaintiffs instituted this action in the unwarranted and ill-advised hope that they could create a racially segregated school in Central High School. It is a dream which anyone familiar with the Federal decisions should know cannot be realized. If Central High School is constructed as a facility to house the children from the three schools which presently serve only white children, its physical plant will, of course, remain unchanged. Its complexion, however, will not.

Under the decisions of the Supreme Court of the United States and the Acts of the Congress, the Board of Education of Beaufort County can no longer legally impose segregation of the races in any school. Therefore, the real question to be resolved by the County Board of Education, the Board of County Commissioners, and the State Board of Education is whether it is in the best interest of the children who live in District III to have a *single* integrated high school or *three* integrated high schools. The question whether the schools of Beaufort County will be integrated in the future is no longer open. At the time of the bond election, defendant Boards apparently did not believe that the situation which now confronts them could possibly materialize. Having assumed the responsibilities of their respective offices, board members are required by their oaths to face realities now and, having done so, to take the steps which, in their best judgment, will serve the highest good of all the school children, for whom they are trustees. It behooves defendants to see to it that the citizens understand the exigencies which confront not only defendant Boards but every member of the body politic. Democracy is based upon the premise that the citizenry, if educated and enlightened, will do what is required of it to preserve government by law. The preservation of our form of government, therefore, depends upon an adequate system of public education.

Since defendant Board of County Commissioners has not acted upon defendant School Board's request that it approve a reallocation of the funds in question, the latter has no authority, acting alone, to make the reallocation. Until defendant Commissioners approve the request, defendant School Board may not proceed. The order of Judge Mintz is reversed and the injunction is reinstated.

Reversed and remanded.

MOORE, J., not sitting.

LAKE, J. Concurring. I concur in the result reached by the majority opinion. I also agree that the reasons there advanced are sufficient to support the reinstatement of the injunction for the present. However, I would reach that result on a ground much more fundamental and more enduring than the absence, as of the present, of a resolution by the Board of County Commissioners. Because of this, and my inability to concur in some of the statements in the majority opinion, I shall state my own view of the matter.

The question is not whether the schools as originally proposed shall be constructed or whether, if constructed, they can be operated as the defendants contemplated when they submitted the bond issue to the voters. The question is whether the proceeds of a bond issue, submitted to and approved by the voters on the basis of a definite, specific proposal for the construction or improvement of certain named public schools, may lawfully be spent by the defendants for the construction of an entirely different school. In my opinion the answer should be "No" and it would make no difference if the Board of County Commissioners had already adopted and recorded a resolution approving the change in purpose.

The appellants in their argument make it clear that they do not question the good faith of the defendants in submitting the original, specific proposal to the people of the county as the statement of the purposes for which the proceeds of the bonds would be used. But for actions of the federal government, in which the defendants had no voice, the proceeds of the bonds would have been used as stated by the defendants in their pre-election campaign releases, which were designed to persuade the people to vote for approval of the bond issue. Those actions have forced the defendants into a dilemma which they did not anticipate when they submitted their proposal to the voters of the county.

For the purposes of the present discussion, I assume that it is now impossible, legally and practically, for the defendants to operate the originally contemplated schools in the originally contemplated manner, tested and proved to be wise and beneficial by over sixty-five years of experience in this State. It may also be true that the school construction and operation now proposed as a substitute for the original plan, by which the voters were persuaded to approve the bond issue, is wiser and will be better for the people of Beaufort County than the original proposal would have been under today's conditions. That is not the question for us to decide. Nor, in my opinion, is that a question for these defendants to decide, at least so far as the expenditure of the proceeds of these bonds is concerned.

That is a question which should be submitted to the people of Beaufort County, whose children are to be educated and whose homes and farms and business properties are to be taxed in order to pay the bonds. It may well be that, given an opportunity, they will approve the use of bond proceeds to build the schools now proposed by the defendants, but fair play demands that they be given the opportunity to say "No."

In *Waldrop v. Hodges,* 230 N.C. 370, 53 S.E. 2d 266, Barnhill, J., later C.J., spoke for this Court with reference to a school bond issue, approved by the voters on the basis of a proposal to use such proceeds to build new schools, the plan thereafter being changed so as to divert the proceeds to the enlargement of existing schools. He said:

> "The law is founded on the principle of fair play, and fair play demands that defendants keep faith with the electors of the district and use the proceeds for the purpose for which the bonds were authorized — the erection and equipment of new buildings and the purchase of sites therefor * * * Use for any other purpose (*i.e.,* enlarging existing schools) would constitute an unauthorized diversion against which plaintiff is entitled to injunctive relief."

See also, *Lewis v. Beaufort County,* 249 N.C. 628, 107 S.E. 2d 77.

I have no thought of charging any defendant in this action with bad faith or with having, at any time, any purpose other than to provide for the children of Beaufort County the best public school system possible under the oppressive and, in my opinion, unconstitutional interference of the federal government by which they are presently hampered and restricted. The fact remains, as shown in the record before us, that, in order to persuade the people of Beaufort County to vote for the bond issue, they caused representations to be made to the people that the proceeds of the bond issue would be used to build and improve certain schools, the itemized list of the proposed constructions and improvements being published and circulated as a campaign document prior to the election. Now, after the election, they propose to spend the money to build different schools. To do so, however worthy the motive, is to break faith with the people and to make a mockery of the law requiring the bond issue to be submitted to the vote of the people.

To be sure, the proceeds of these bonds will, under the present proposal, be used for school construction and not for roads, hospitals or courthouses. Nevertheless, the presently proposed use is utterly different from that which the voters approved. To be sure,

the ballots on which they recorded their votes did not carry the proposal in itemized form, but the defendants, acting in the utmost good faith, publicized the itemized, original proposal and asked the people to vote for the bonds so that it could be put into effect. Whether that campaign document carried the election for the bond issue no one can presently say with certainty, but there is a way to find out. The matter should be resubmitted to a vote of the people before the proceeds of these bonds are spent and, if the people disapprove the change in plan, the proceeds of such bonds as have been issued should be held for their retirement.

A truly liberal construction of provisions of the Constitution and of statutes dealing with the pledging of the public credit and the expenditure of the public funds is not one which, for fear that the people may not approve the expenditure, denies them the right to vote upon the question and places the power to determine the matter in the hands of a board or commission, however wise and honorable. The truly liberal construction of these provisions of the law is that which enlarges the power of the people to determine their own destiny by deciding what obligations they will assume and for what purpose.

I cannot agree with the statement in the majority opinion that the Constitution of the United States means whatever five out of nine members of the Supreme Court of the United States may see fit, from time to time, to say that it means. This, in my opinion, is a far more significant matter than the use to be made of the proceeds of these bonds. The statement is as inaccurate as it would be to say that the Constitution of North Carolina means whatever four of us may see fit to say it means. The decision of a majority of this Court, applying the provisions of the Constitution of North Carolina, as we understand them, to a matter before us, is the final adjudication of the rights of the parties in that particular lawsuit and is a precedent which the judges of the other courts of this State must follow in deciding subsequent cases of like nature, until it is overruled by us or by our successors or by the people, themselves, through the amending process. Nevertheless, we have no authority to change the true meaning of the Constitution of North Carolina by our fiat. The Supreme Court of the United States has no greater authority in its field. In my judgment, the distinction is a vitally important one which must be kept before ourselves and before the people of America if our country is to avoid the smothering of freedom beneath the robes of a judicial despotism.

The Constitution of the United States, itself, in explicit, clear

language declares what is the supreme law of the land. It states in Article VI, Section 2:

> "This constitution, and the laws of the United States which shall be made in pursuance thereof, and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land, and the judges in every state shall be bound thereby, anything in the constitution or laws of any state to the contrary notwithstanding."

That provision I am bound by my oath as a member of this Court to support and defend. It requires me to recognize the difference between "the law of the land" and judicial lawlessness regardless of the court in whose decrees it may be found. The Constitution does not declare a decision of the United States Supreme Court to be the supreme law of the land. On the contrary, it declares that such decision is not the "law of the land" if it is in conflict with the Constitution, itself.

I agree, of course, that this Court and all other courts, both state and federal, must now decide cases brought before us or them as if the decision of the United States Supreme Court in *Brown v. Board of Education,* 347 U.S. 483, 74 S. Ct. 686, were a correct interpretation of the Fourteenth Amendment to the United States Constitution, but I cannot concur in the statement that it is so, or in the thought that the Constitution which I have sworn to support and defend actually means no more than five judges see fit to say that it means; that its true meaning varies from opinion day to opinion day. This, in effect, means that there can be no distortion, no misconstruction, no violation of the Constitution of this State by this Court or of the Constitution of the United States by the Supreme Court of the United States; that a court of last resort can do no wrong. That I believe to be a dangerous fallacy.

This error in the majority opinion is not removed by inserting the phrase "for all practical purposes." There is a practical value in recognizing the difference between what the Constitution of our country really means and what a majority of the Supreme Court of the United States says it means. There is always practical value in recognizing the difference between right and wrong even though one is without power to prevent the wrong. The first step in curing a disease is to recognize the difference between sickness and health. But, if indeed we be only "a voice crying in the wilderness" I believe it our duty to exert that effort to "make straight the path."