JAMES F. HUGHEY v. POLIE Q. CLONINGER, GEORGE A. JENKINS, BUD
    BLACK, GENE CARSON, HARLEY B. GASTON, JR., ROBERT A.
    HEAVNER, AND CHARLES A. RHYNE, COUNTY COMMISSIONERS OF GASTON
    COUNTY; AND GASTON COUNTY

No. 4

(Filed 20 April 1979)

1. **Counties § 6.2; Schools § 1— school for dyslexic children—appropriation by
   county commissioners—absence of statutory authority**

   An appropriation by a board of county commissioners to a school for
   dyslexic children was not authorized by G.S. 153A-248(a)(2), the statute
   authorizing appropriations to sheltered workshops and like institutions which
   provide work or training for the physically and mentally handicapped, since (1)
   the school for dyslexic children is not like a sheltered workshop because the
   sheltered workshop seeks to *rehabilitate* patients who are mentally and
   physically deficient through work and vocational training and the school for
   dyslexic children seeks to *treat* the linguistic difficulties of children of average
   and above average intelligence in an academic setting; (2) the General
   Assembly intended to attack the problem of children with learning disabilities
   exclusively through programs administered by the State Board of Education
   and the local boards of education, to wit, education expense grants to "excep-
   tional children" under G.S. 115-315.7 and special education subsidies to private
   schools under G.S. 115-384 and G.S. 115-377; and (3) the General Assembly has
   consistently delegated broad policy-making and budgetary authority in the
   field of special education to the State and local boards of education.

2. **Counties § 6.2; Schools § 1— school for dyslexic children—appropriation by
   county commissioners—absence of statutory authority**

   An appropriation by a board of county commissioners to a school for
   dyslexic children was not authorized by G.S. 153A-149(c)(30) or G.S. 153A-255,
   statutes authorizing appropriations respectively for "public assistance pro-
   grams" or "social service programs" of the type created by Chapters 108 and
   111 of the General Statutes, since such programs are addressed exclusively to
   the problems of poverty, whereas a school for dyslexic children is addressed
   exclusively to the treatment of a learning disability without regard to the
   financial status of those afflicted.

3. **Counties § 6.2; Schools § 1— school for dyslexic children—appropriation by
   county commissioners—absence of statutory authority**

   An appropriation by a board of county commissioners to a school for
   dyslexic children was not authorized under the scheme for public education
   adopted by the General Assembly pursuant to its constitutional duty to "pro-
   vide . . . for a general and uniform system of free public schools," Art. IX,
   § 2(1) of the N.C. Constitution, since the county commissioners have been
   given the power to fund only those school-related programs proposed by the
   board of education. G.S. Ch. 115.

Hughey v. Cloninger

**4. Taxation § 7— means of accomplishing public purpose—disbursement of funds to private entity**

   Under Art. V, § 2(7) of the N.C. Constitution, the direct disbursement of public funds to private entities is a constitutionally permissible *means* of accomplishing a public purpose provided there is statutory authority to make such appropriation.

   Justice EXUM dissenting.

ON petition for discretionary review of the decision of the Court of Appeals, 37 N.C. App. 107, 245 S.E. 2d 543 (1978), reversing judgment of *Ervin, J.*, entered 14 July 1977 in GASTON Superior Court. This case was docketed and argued as No. 126 at the Fall Term 1978.

On 15 January 1977 the Gaston County Commissioners appropriated the sum of $47,068.00 to be disbursed directly to the Dyslexia School of North Carolina, Inc.

This is an action by James F. Hughey, a citizen and taxpayer of Gaston County, seeking to permanently enjoin Gaston County and its Board of Commissioners from appropriating or disbursing funds to the Dyslexia School of North Carolina. Plaintiff alleges this appropriation (1) was not authorized by statute and (2) violated the Constitution of North Carolina.

As of the filing of plaintiff's complaint on 18 April 1977 Gaston County had disbursed directly to the school approximately $22,068 of the $47,068 appropriated. The parties agreed that no funds had been disbursed since 18 April 1977 and that no funds would be disbursed in the future until the legality of the appropriation had been resolved.

The Dyslexia School of North Carolina, Inc., is a nonprofit corporation organized under Chapter 55A of the General Statutes of North Carolina. The purpose of the school is "to operate exclusively for educational purposes and to furnish programs of instruction for children with dyslexia." The school is an approved non-public school certified by the North Carolina State Department of Public Instruction as a special school. This approval allows school-aged children to attend the school in lieu of the public schools without violation of compulsory school attendance requirements.

The trial court sustained the legality of the appropriation, concluding, in pertinent part, that the funds appropriated by Gaston County were for a public purpose in the constitutional sense and that the appropriation was made to provide for educational needs not adequately provided in the public schools of Gaston County.

On plaintiff's appeal the Court of Appeals held that the funds appropriated by Gaston County were not for a public purpose in the constitutional sense. Defendants' petition for discretionary review of that decision was allowed by this Court.

*Roberts and Planer, P.A., by Joseph B. Roberts III, for plaintiff appellee.*

*Hollowell, Stott and Hollowell by Grady B. Stott; Whitesides and Robinson, by Henry M. Whitesides, for defendant appellants.*

*Charles Ronald Aycock and Durward Franklin Gunnells, for amicus curiae, North Carolina Association of County Commissioners.*

*Tharrington, Smith & Hargrove, by George T. Register, Jr., for amicus curiae, North Carolina School Boards Association.*

*Chambers, Stein, Ferguson & Becton, P.A., by James C. Fuller, Jr., for amicus curiae, North Carolina Association of Educators.*

HUSKINS, Justice.

This appeal challenges the legality of an appropriation made by the Gaston County Board of Commissioners to the Dyslexia School of North Carolina, Inc.

It is axiomatic that a county has no power to appropriate funds unless authorized to do so by the General Assembly. The General Assembly determines the purposes for which a county may appropriate funds, which funds shall be utilized, and the manner in which appropriations are to be made. As Justice Bobbitt, later Chief Justice, states in *Harris v. Board of Commissioners*, 274 N.C. 343, 163 S.E. 2d 387 (1968):

"Counties are creatures of the General Assembly and constituent parts of the State government. They possess only

such powers and delegated authority as the General Assembly may deem fit to confer upon them." (Citations omitted.)

Thus, the initial and dispositive question in this appeal is whether there was sufficient *statutory* authority for the appropriation made by the Gaston County Board of Commissioners to the Dyslexia School of North Carolina, Inc.

[1] The Board of Commissioners contends its appropriation is authorized by G.S. 153A-248(a)(2) which provides:

"(a) A county may appropriate revenues not otherwise limited as to use by law:

*     *     *     *

(2) To a sheltered workshop or other private, non-profit, charitable organization offering work or training activities to the physically or mentally handicapped, and may otherwise assist such an organization."

Does an appropriation to a school for dyslexic children come within the ambit of a statute authorizing appropriations to sheltered workshops and like institutions which provide work or training for the physically and mentally handicapped? We think not. Our studies, summarized below, have led us to conclude that the sheltered workshop is designed to deal with health problems fundamentally different from those presented by dyslexic children. As a consequence the objectives, organizational structure, and therapeutic philosophy of a sheltered workshop are markedly different from those of a school for dyslexic children.

The objective of a sheltered workshop is to help people handicapped by mental illness or physical disability to "achieve the maximum functioning of which they are capable." I. Zwerling, *Aftercare Systems*, in 5 American Handbook of Psychiatry 729 (D. Freedman, J. Dyrud eds. 1975). To accomplish this objective the sheltered workshop provides a working environment similar to that in the real world in which the patient works at a job and receives training in vocational and social skills. The therapeutic philosophy of a sheltered workshop is to *rehabilitate* the handicapped patients rather than to *treat* the underlying causes of their physical or mental disability. Treatment "represents a

direct attack on the disabilities of the patient, while [rehabilita-tion] represents an effort to identify and exploit the patient's assets to the end of providing the best possible community role." *Id.* Ultimately, it is hoped the rehabilitative program provided by the sheltered workshop will help make "the transition to autonomous community life easier for the patient." F. Braceland, *Rehabilitation*, in 5 American Handbook of Psychiatry 695. One of the best known sheltered workshop programs is operated by Goodwill Industries. In 1969 Goodwill Industries "estimated its workshops were servicing about 24,000 people per day and restor-ing 7000 of them to the labor market." *Id.*

"The label 'dyslexia' has been overused in recent years. There is, however, a measure of agreement that the term implies the inability to cope with written and printed language in children who have average or better intellectual endowment and whose reading, writing, and spelling performance is considerably below their achievement in non-language-related subjects." K. de Hirsch, *Language Disabilities*, in 2 Comprehensive Textbook of Psychiatry—II 2112-2116 (A. Freedman, H. Kaplan, B. Sadock eds. 1975). The objective of a school for dyslexic children is to help such children, who are of normal and above average intelligence, overcome the linguistic difficulties which hamper their academic progress in the fields of reading and writing. To accomplish this objective schools for dyslexic children provide their pupils with special remedial education designed to help them overcome their severe difficulties with language in an academic setting otherwise comparable to regular schools. Ultimately it is hoped the pupils can overcome their reading and writing difficulties to the point where they can return to regular schools. The therapeutic philosophy of these schools is treatment-oriented. Their goal is to turn hopelessly confused pupils into adequate readers and writers by directly attacking the perceptual difficulties which afflict them.

From this discussion it should be apparent that the sheltered workshop and the school for dyslexic children are fundamentally different institutions. The former seeks to *rehabilitate* patients who are mentally and physically deficient through work and voca-tional training, while the latter seeks to *treat* the linguistic dif-ficulties of children of average and above average intelligence in an academic setting. Our studies have convinced us that G.S.

153A-248(a)(2) cannot be reasonably interpreted to encompass schools for dyslexic children.

Defendants argue that G.S. 153A-248(a)(2) should be liberally construed so as to enable boards of county commissioners to supplement the budgets of private special education facilities when it appears that the public school system cannot adequately provide for the special needs of all its learning disabled children. According to defendants the undisputed and urgent needs of learning disabled children who are not receiving adequate educational opportunities in the public school system amply justify a broad construction of G.S. 153A-248(a)(2).

We recognize that valid and urgent problems are presented in those instances where the public school system cannot adequately provide educational opportunities for all of its learning disabled children. However, since the General Assembly has specifically addressed this problem in other legislation, we find it unnecessary to adopt the broad construction requested by defendant. It is well established that where there are two statutes, one dealing specifically with the matter in issue and the other being in general terms which could conceivably address the matter in question, the specific statute controls. *See Utilities Comm. v. Edmisten, Atty. General*, 291 N.C. 451, 232 S.E. 2d 184 (1977). G.S. 115-315.7, *et seq.*, in effect at the time the instant appropriation was made, deals specifically with the problems the Gaston County Board of Commissioners sought to remedy through its appropriation to the Dyslexia School of North Carolina.

Following is the statement of legislative policy and purpose declared in G.S. 115-315.7:

"The General Assembly of North Carolina recognizes that in unusual circumstances the public schools of this State cannot provide the necessary training for all of its exceptional children. It is further recognized that, in order for the exceptional child to obtain a proper education, it may become necessary for the child to attend a private or out-of-state institution. So that all of our young children may be trained to be useful citizens, and to provide our children with this opportunity where it may not exist in the public schools, it shall be the policy of this State to make an educational expense grant available to each eligible child as provided under

this Article, for the private or out-of-state education of such child."

The term "exceptional children" encompasses "severely learning disabled" children who suffer from dyslexia. G.S. 115-315.8(1). The tuition grants authorized by G.S. 115-315.7 are to be administered by the State Board of Education in cooperation with local boards of education. G.S. 15-315.11 and G.S. 15-315.12. Moreover, as part of comprehensive new legislation in the field of special education, effective 1 July 1977, the General Assembly specifically authorizes direct subsidies by State and local boards of education to private schools devoted to special education and to regular private schools so as to enable them to provide special education and related services. *See* G.S. 115-384; G.S. 115-377. Thus while the general terms of G.S. 153A-248(a)(2) could conceivably be construed to address the problem of inadequate educational opportunities for learning disabled children in the school system, it is evident that the specific remedies prescribed in G.S. 115-315.7, *et seq.*, G.S. 115-384, and G.S. 115-377 are controlling.

Finally, we note the General Assembly has consistently delegated specific responsibility for the special education of learning disabled children to the State and local boards of education. *See* G.S. 115-315.16, *et seq.* (superseded by G.S. 115-363, *et seq.*); G.S. 115-315.7, *et seq.*; G.S. 115-315.23, *et seq.* Given this pattern of specific and comprehensive legislation in that field it is highly unlikely the General Assembly intended, by enacting G.S. 153A-248(a)(2), to authorize county boards of commissioners to appropriate funds directly to schools for dyslexic children. Such a result would be inconsistent with the broad policy-making and budgetary authority granted the State and local boards of education in the field of special education.

We therefore hold that the appropriation by the Gaston County Board of Commissioners to the Dyslexia School of North Carolina is not authorized by G.S. 153A-248(a)(2).

[2] The Board of Commissioners next contends its appropriation is authorized by both G.S. 153A-149(c)(30) and G.S. 153A-255. In pertinent part, these statutes authorize appropriations respectively for "public assistance programs" or "social service programs" of the type created in Chapters 108 and 111 of the General

Statutes. We have analyzed these statutes and reached the conclusion that neither statute, when fairly construed and applied to the facts here, authorizes the appropriation under challenge. A review of the various aid programs established by Chapters 108 and 111 of the General Statutes indicates that the education of dyslexic children is not the type of "social service program" or "public assistance program" contemplated by these chapters. The programs in Chapters 108 and 111 are responsive to the needs of impoverished citizens who are unable to provide for the basic necessities of life. The programs authorized in these chapters provide financial aid to those citizens who are aged and disabled and lack sufficient resources "to provide a reasonable subsistence," G.S. 108-25(2); to dependent children who have "no adequate means of support," G.S. 108-38(a)(3); to citizens who cannot afford adequate health care, *see* G.S. 108-59 through 61.4; to "needy children who are placed in foster homes," G.S. 108-66; to the needy blind, *see* G.S. 111-13 *et seq.* In sum, the programs in Chapters 108 and 111 are addressed exclusively to the problems of poverty; whereas a school for dyslexic children is addressed exclusively to the treatment of a learning disability without regard to the financial status of those afflicted. We therefore hold that the challenged appropriation is not authorized by either G.S. 153A-149(c)(30) or G.S. 153A-255.

[3] Since dyslexia constitutes a learning disability which is remedied through special education, the challenged appropriation might be justified as an exercise of the constitutional duty to "provide . . . for a general and uniform system of free public schools." N.C. Const., Art. IX, § 2(1). Such duty is constitutionally vested in the General Assembly. As Justice Barnhill, later Chief Justice, explains in *Coggins v. Board of Education*, 223 N.C. 763, 28 S.E. 2d 527 (1944):

> "The establishment and operation of the public school system is under the control of the legislative branch of the government, subject only to pertinent constitutional provisions as to uniformity."

In its discretion the General Assembly may delegate to local administrative units the general supervision and control of schools within their boundaries. *See Coggins v. Board of Education*, supra. Thus, the validity of this appropriation under the duty to

provide "free public schools" depends on whether the General Assembly has delegated to boards of county commissioners the power to initiate and fund their own programs for the public schools. *See generally, Harris v. Board of Commissioners, supra.*

Pursuant to its duty to establish a general and uniform system of free public education, the General Assembly in Chapter 115 of the General Statutes has delineated the purpose and structure of public education in North Carolina. A review of this legislation leads us to conclude that the General Assembly has not delegated to boards of county commissioners the power to initiate and fund their own programs for the public schools; rather, county commissioners are delegated the power to fund only those school-related programs proposed by the board of education.

In the scheme of public education adopted by the General Assembly, the "general control and supervision of all matters pertaining to the public schools in their respective administrative units" is delegated to the county and city boards of education, subject to any paramount powers vested by law in the State Board of Education or any other authorized agency. G.S. 115-27. The board of education determines in the first instance the needs of its school system and proposes a budget to the board of county commissioners. The role of the county commissioners is to study the request for funds and provide by taxation such funds, and only such funds, as may be needed for economical administration of the schools. *See* G.S. 115-100.5 through 100.14; *Administrative Unit v. Commissioners of Columbus,* 251 N.C. 826, 112 S.E. 2d 539 (1960). It is well established that the role of the board of county commissioners in the funding of the school budget is not to interfere with the general control of the schools vested in the board of education. *See Dilday v. Board of Education,* 267 N.C. 438, 148 S.E. 2d 513 (1966), and cases cited therein. Thus, under the scheme for public education devised by the General Assembly, the board of commissioners is empowered to appropriate funds only for items that are included by the board of education in its annual school budget. The board of county commissioners, absent statutory authority, cannot on its own initiative devise and fund programs for the school system. The program of aid for the Dyslexia School of North Carolina was devised and funded by the Gaston County Board of Commissioners on its own initiative. It follows, therefore, that the appropriation made directly to the

school by that board was not authorized under the statutory scheme for public education adopted by the General Assembly.

[4]  In conclusion, we note the Court of Appeals reached the right result but for the wrong reason. It held that the challenged appropriation was prohibited by Article V, section 2(1) of the North Carolina Constitution which requires that all government expenditures be for a public purpose. *See generally, Mitchell v. Financing Authority*, 273 N.C. 137, 159 S.E. 2d 745 (1968). The court reasoned that *direct disbursement* of public funds to private entities, such as this school, "could not be the *means* used to effect a public purpose." 37 N.C. App. at 112.

The constitutional problem under the public purpose doctrine perceived by the Court of Appeals is no longer present in view of the addition, effective 1 July 1973, of subsection (7) to Article V, section 2 of the North Carolina Constitution. Subsection (7) provides that the General Assembly may enact laws which permit the State, county, city or town, or any other public corporation to "contract with and appropriate money to any person, association, or corporation for the accomplishment of public purposes only." Thus, under subsection (7) *direct disbursement* of public funds to private entities is a constitutionally permissible *means* of accomplishing a public purpose provided there is statutory authority to make such appropriation. Had there been such statutory authority in this case the direct appropriation of funds by Gaston County to the Dyslexia School of North Carolina would have presented no "public purpose" difficulties as it is well established that both appropriations and expenditures of public funds for the education of the citizens of North Carolina are for a public purpose. *Education Assistance Authority v. Bank*, 276 N.C. 576, 174 S.E. 2d 551 (1970). We note that cases from this Court cited by the Court of Appeals in support of its reasoning were decided on facts arising prior to the effective date of subsection (7).

Since this case is decided on statutory grounds, further discussion of the constitutional questions raised by this appeal is unnecessary. *See State v. Blackwell*, 246 N.C. 642, 99 S.E. 2d 867 (1957), and cases collected in 1 N.C. Index 3d, Appeal and Error § 3, n. 31.

The sum appropriated by the Gaston County Board of Commissioners to the Dyslexia School of North Carolina totaled

$47,068.00. As of the filing of plaintiff's complaint, Gaston County had disbursed to the school approximately $22,068.00 of the sum appropriated. The parties agreed no funds would be disbursed in the future until the legality of the appropriation had been resolved. Thus, there now remains the matter of appropriate relief in regard to the $47,068.00 appropriation. With respect to this question we note the disbursement made prior to the commencement of this action was in good faith, for a commendable public purpose, and that Gaston County received the benefit of such expenditure. Therefore, relief in this case should be confined to restraining any further direct appropriations and disbursements by defendants to the Dyslexia School of North Carolina. *See Comrs. of Brunswick v. Inman*, 203 N.C. 542, 166 S.E. 519 (1932). *See also, Improvement Co. v. Greensboro*, 247 N.C. 549, 101 S.E. 2d 336 (1958); *Manufacturing Co. v. Charlotte*, 242 N.C. 189, 87 S.E. 2d 204 (1955); *Hawkins v. Dallas*, 229 N.C. 561, 50 S.E. 2d 561 (1948); *Realty Co. v. Charlotte*, 198 N.C. 564, 152 S.E. 686 (1930); *McPhail v. Commissioners*, 119 N.C. 330, 25 S.E. 958 (1896). It is so ordered.

For the reasons stated in this opinion the result reached by the Court of Appeals is

Affirmed.

Justice EXUM dissenting.

As the majority notes at the outset, there are two issues in this case: (1) whether the appropriation of funds by the Gaston County Commissioners to the Dyslexia School of North Carolina is in violation of the North Carolina Constitution, and (2) whether it is authorized by statute. The majority correctly concludes that this appropriation is consistent with Article V(2)(7) of the North Carolina Constitution. The problem, then, is whether there is statutory authorization for it.

On this point, I disagree with the majority. G.S. 153A-248(a) (2) does provide authority for this appropriation. That statute reads:

"(a) A county may appropriate revenues not otherwise limited as to use by law:

*       *       *       *

(2) To a sheltered workshop *or other private, nonprofit, charitable organization offering work or training activities to the physically or mentally handicapped*, and may otherwise assist such an organization." (Emphasis supplied.)

The majority has essentially held that the Dyslexia School cannot fall within this statute because it is not *like* a sheltered workshop. In so doing it has unduly narrowed the scope of this provision. It has read its definition of "sheltered workshop" into the remaining language of the statute. Such a restrictive meaning should not be given wording which on its face is quite broad — "other private, nonprofit, charitable organization offering work or training activities to the physically or mentally handicapped."

The Dyslexia School is a nonprofit organization. The children it serves suffer from a handicap that makes it difficult for them to cope in society. The handicap is either physical or mental or both. The school offers them training and instruction with the goal of enabling them to receive an adequate education. The school and its activities, therefore, fit precisely within the provisions of G.S. 153A-248(a)(2).

The majority makes much of a supposed difference between "rehabilitation" and "treatment." This difference is one created largely by the highly selective definitions of these terms in the majority opinion. Even if it does exist, it is important only when the statutory provisions are given the narrow construction the majority attaches to them. The goals of a sheltered workshop and the Dyslexia School are essentially the same. Both work with persons with handicaps, seeking to help them cope in society despite their handicaps. Even if their methods differ, the statutory language is broad enough to encompass both.

Next the majority argues that because there are other statutes which address the problem of children with learning disabilities, the General Assembly did not intend for G.S. 153A-248(a)(2) to deal with it. The majority says that the legislature intended to attack this problem exclusively through programs administered by those agencies which administer the public schools, to wit, education expense grants to "exceptional children," G.S. 115-315.7, *et seq.*, and special education services for "children with special needs," G.S. 115-363, *et seq.*, particularly G.S. 115-366, 115-367, 115-377, 115-384.

The majority recognizes that serious, urgent needs arise "where the public school system cannot adequately provide educational opportunities for all of its learning disabled children." This, precisely, is the problem which, the record shows, has arisen with dyslexic children in Gaston County. In addition to efforts of the public school administrators, the elected representatives of the people of that county desire to support what, the record reveals, is an effective attack on the problem of dyslexia.

The majority does not tell us why the General Assembly might not have intended to attack this problem both through programs under the auspices of the public school administrators and through boards of county commissioners via such provisions as G.S. 153A-248(a)(2). It relies on a maxim of statutory construction that where one statute deals specifically with a matter in issue and another only in general terms the specific statute controls and cites *Utilities Commission v. Edmisten*, 291 N.C. 451, 232 S.E. 2d 184 (1977). The maxim relied on simply has no application here. Indeed, as it applies this maxim the majority reaches an incredibly strange result.

The fallacy of the majority's argument, that because the General Assembly has authorized public school administrators to deal with learning disabilities it could not have meant for county commissioners also to do so, becomes apparent when the definitions of "exceptional children" entitled to education expense grants and "children with special needs" entitled to special education services are considered. An "exceptional child" is defined by G.S. 115-315.8 as:

"[T]he seriously emotionally disturbed, the severely learning disabled, the *visually and/or hearing handicapped or impaired, the multiple handicapped, the mentally retarded, the crippled or other health-impaired child.*" (Emphasis supplied.)

"Children with special needs" are defined by G.S. 115-366 as including:

"[A]ll children between the ages of five and 18 who because of permanent or temporary mental physical or emotional handicaps need special education, are unable to have all their needs met in a regular class without special education or related services, or are unable to be adequately educated in

the public schools. It includes those who are *mentally retarded*, epileptic, learning disabled, cerebral palsied, seriously emotionally disturbed, *orthopedically impaired*, autistic, *multiply handicapped*, pregnant, *hearing-impaired, speech-impaired, blind or visually-impaired*, genetically impaired, and gifted and talented." (Emphasis supplied.)

Many "exceptional children" and "children with special needs" who are physically or mentally handicapped, mentally retarded, or orthopedically impaired, are eligible for help both at "sheltered workshops" and "other private, nonprofit, charitable organization[s]" as those terms are used in G.S. 153A-248(a)(2) *and defined by the majority*. Such children are "rehabilitated" by these institutions *even within the majority's definition of this term*. Such children could thus receive assistance under both G.S. 153A-248 *and* the statutes providing for "exceptional children" and "children with special needs." According to the logic of the majority's argument, however, county commissioners should not be able to appropriate money under G.S. 153A-248 to private organizations which serve these children because the General Assembly has provided for other means of helping them through "education expense grants" and "special education services" under auspices of public school administrators.

Obviously the General Assembly never intended such a result. It did not, in other words, intend to make the programs administered by public school administrators the exclusive tools by which this state can deal with the problem of its children who are physically or mentally handicapped, mentally retarded, or orthopedically impaired. The legislature intended, I am convinced, to authorize not only public school administrators but also county commissioners to help these children, the latter by direct appropriation to such organizations as sheltered workshops and "other private, nonprofit, charitable organization[s]," such as the Dyslexia School here, which help children who are disabled in all the various ways set out in all these statutes.

This is why the majority has applied the wrong maxim of statutory construction to this case. The proper maxim to be applied is that remedial statutes are to be liberally, not stintingly, construed. *Puckett v. Sellars*, 235 N.C. 264, 69 S.E. 2d 497 (1952);

*State v. Lovelace*, 228 N.C. 186, 45 S.E. 2d 48 (1947). So construed G.S. 153A-248(a)(2) clearly authorizes the challenged appropriation.

Moreover, the majority has relied on an incomplete statement of the maxim it chooses to apply. The maxim, completely stated, is that a statute dealing specifically and in detail with a subject controls as against a more general statute dealing with the same subject *only when* the two statutes are necessarily inconsistent and both cannot be given effect. In *Utilities Comm. v. Edmisten, Attorney General, supra,* 291 N.C. 451, 232 S.E. 2d 184, relied on by the majority, the general statute, as interpreted by the Commission, and the specific statute, as ultimately interpreted by this Court, were necessarily inconsistent, and both could not be given effect. We held that under these circumstances, and assuming the Commission's interpretation to be correct, the specific statute should nevertheless control. For this complete rendering of the maxim see N.C. Digest, Statutes, § 223.4 and cases therein annotated. Clearly G.S. 153A-248(a)(2) and those provisions of Chapter 115 relied on by the majority are not necessarily inconsistent. Both can, and should be, given effect.

For these reasons, I respectfully dissent and vote to reverse the Court of Appeals and affirm the trial court.