W.D. GOLDSTON, JR., JAMES E. HARRINGTON, AND CITIZENS, TAXPAYERS, AND BOND-HOLDERS SIMILARLY SITUATED v. STATE OF NORTH CAROLINA AND MICHAEL F. EASLEY, GOVERNOR, INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY

No. 328PA04-2

(Filed 15 December 2006)

**Declaratory Judgments; Jurisdiction— standing—individual taxpayers—diverting tax levies appropriated for one purpose but disbursed for another**

The trial court erred by concluding that individual taxpayers did not have standing to seek relief when they allege government officials violated statutory and constitutional provisions by diverting tax levies appropriated for one purpose but disbursed for another (plaintiffs alleged the transfers of $80,000,000 by the Governor and $125,000,000 by the General Assembly from the Highway Trust Fund to the General Fund were unlawful diversions of Highway Trust Fund assets since disbursement of those funds is not allowed for any projects other than those specified by statute), and a declaratory judgment was the proper remedy for such a claim, because: (1) a declaratory judgment would serve to clarify and settle the legal rights and responsibilities of the

Governor and the General Assembly, as well as the legal status of the taxpayer funds in the Highway Trust Fund; (2) a declaratory judgment would terminate the uncertainty and controversy giving rise to the action; (3) a declaration on the legality and constitutionality of the Governor and the General Assembly's diversions from the Highway Trust Fund may well be the most assured and effective remedy available since if plaintiffs ultimately prevail, their point is made, similar future diversions will be obviated without requiring that the State undertake substantial and undoubtedly disruptive budgetary gyrations necessary to return immediately the funds at issue, and if plaintiffs do not prevail, the Governor and the General Assembly will have done no harm; and (4) while federal standing doctrine can be instructive as to general principles and for comparative analysis, the nuts and bolts of North Carolina standing doctrine are not coincident with federal standing doctrine.

Chief Justice PARKER dissenting.

Justices MARTIN and TIMMONS-GOODSON did not participate in the consideration or decision of this case.

On discretionary review pursuant to N.C.G.S. § 7A-31 of a unanimous decision of the Court of Appeals, 173 N.C. App. 416, 618 S.E.2d 785 (2005), affirming a judgment allowing summary judgment for defendants and dismissing plaintiffs' complaint entered 29 January 2004 by Judge Joseph R. John, Sr. in Superior Court, Wake County. Heard in the Supreme Court 16 October 2006.

*Boyce & Isley, PLLC, by G. Eugene Boyce and Philip R. Isley, for plaintiff-appellants.*

*Roy Cooper, Attorney General, by Grayson G. Kelley, Chief Deputy Attorney General; John F. Maddrey, Assistant Solicitor General; and Norma S. Harrell, Special Deputy Attorney General, for defendant-appellees.*

*Ellis & Winters LLP, by Julia F. Youngman and Thomas H. Segars, and Robert F. Orr for the North Carolina Institute for Constitutional Law, amicus curiae.*

EDMUNDS, Justice.

In this case, we must determine whether individual taxpayers have standing to seek relief when they allege government officials

violated statutory and constitutional provisions by diverting tax levies appropriated for one purpose but disbursed for another. If so, we next must decide whether a declaratory judgment is a proper remedy for such a claim. We reaffirm our long-standing holdings that taxpayers have standing to challenge unlawful or unconstitutional government expenditures and conclude that taxpayers are entitled to seek equitable relief in the form of a declaratory judgment. Accordingly, we reverse the opinion of the Court of Appeals.

The General Assembly created the North Carolina Highway Trust Fund in 1989, establishing a special account within the State Treasury to provide multiyear funding for highway construction and maintenance. Act of July 27, 1989, ch. 692, secs. 1.1-2.3, 1989 N.C. Sess. Laws 1933, 1933-97 (codified at N.C.G.S. §§ 136-175 to -184.) The Trust Fund is funded through several revenue streams, including motor vehicle title and registration fees; motor fuels excise taxes; alternative fuels excise taxes; motor vehicle use taxes; and interest and income earned by the Trust Fund. As originally enacted, Trust Fund revenues were to be used only for specified projects of the Intrastate Highway System, for specific urban loop highways, and to provide supplemental appropriations for specific secondary roads and for city streets, with a small portion of the Trust Fund allotted for administrative expenses. In addition, the 1989 statute creating the Trust Fund directed that a portion of motor vehicle use taxes be transferred each year from the Trust Fund to the State's General Fund. *Id.*, sec. 4.1 at 1982-83. In 1989, $279,400,000 was transferred to the General Fund. *Id.*, sec. 4.3 at 1983-84. That sum has been adjusted each succeeding fiscal year in accordance with fluctuations in motor vehicle use tax collections, N.C.G.S. § 105-187.9(b)(2), resulting in a total transfer of $252,400,000 for the 2002-2003 fiscal year.

During the 2001-2002 fiscal year, the State faced a budget shortfall. Because Article III, Section 5(3) of the North Carolina Constitution does not allow a deficit for any fiscal period, on 5 February 2002, the Governor, as administrator of the budget, issued Executive Order Number 19. Exec. Or. 19, 16 N.C. Reg. 1866 (Mar. 1, 2002). Among other measures, this Executive Order stated that the Office of State Budget and Management could "transfer, as necessary, funds from the Highway Trust Fund Account for support of General Fund appropriation expenditures." *Id.* Accordingly, on 8 February 2002, the State Budget Officer directed that $80,000,000 be debited from the Highway Trust Fund and credited to the General Fund.

The State faced another budget shortfall for the 2002-2003 fiscal year, and, effective 1 July 2002, the General Assembly transferred an additional $125,000,000 from the Trust Fund to the General Fund. Current Operations, Capital Improvements, and Finance Act of 2002, ch. 126, sec. 2.2(g), 2001 N.C. Sess. Laws (Extra Sess. 2002) 291, 298-99. The General Assembly treated this transfer as a loan from the Trust Fund to the General Fund, with the General Assembly committing itself to returning the $125,000,000, including interest, to the Trust Fund during fiscal years 2004-2005 through 2008-2009. *Id.*, secs. 2.2(g) at 298-99, 26.14 at 457.

Plaintiffs Goldston and Harrington, as North Carolina citizens and taxpayers, brought suit against the State and Governor in November 2002. Plaintiffs alleged the transfers of $80,000,000 by the Governor and $125,000,000 by the General Assembly from the Trust Fund to the General Fund were unlawful diversions of Trust Fund assets because disbursement of those funds is not allowed for any projects other than those specified by statute. The pertinent statute states that the "special objects" of the Trust Fund are the intrastate highways, urban loops, city streets, secondary roads, debt service, and Department of Transportation administrative expenses. N.C.G.S. § 136-176(b) (2005). In addition, plaintiffs also contended these transfers violated the North Carolina Constitution, which mandates that "[e]very act of the General Assembly levying a tax shall state the special object to which it is to be applied, and it shall be applied to no other purpose." N.C. Const. art. V, § 5. Plaintiffs asserted that the statutorily defined "special objects" of the Trust Fund preclude use of Trust Fund assets for General Fund expenditures. Finally, plaintiffs alleged the Governor exceeded his constitutional authority under Article III, Section 5(3). This provision requires the Governor to administer the budget and to ensure that the State does not incur a deficit for any fiscal period, but does not, plaintiffs contend, authorize the Governor to order transfers from the Trust Fund to the General Fund because the Trust Fund is separate from the General Fund and the annual budget process.

Filing suit both as individual taxpayers and on behalf of other citizens similarly situated, plaintiffs alleged they were injured because they had paid motor fuel taxes, title and registration fees, and other highway taxes which by law were collected expressly for application to the Highway Trust Fund but had been diverted for other uses. They argued defendants' actions constituted both a current and future threat of illegal and unconstitutional depletion of Trust Fund assets.

Plaintiffs requested injunctive and declaratory relief, seeking both a declaration that defendants' actions were illegal and unconstitutional and an immediate return of the monies at issue to the Trust Fund. Plaintiffs later abandoned their prayer for relief in the nature of mandamus through which they had requested return of the funds, but they continued to maintain that they faced the threat of future illegal and unconstitutional disbursements from the Trust Fund. In response, the State and the Governor filed a motion to dismiss, arguing that plaintiffs lacked standing "in that they have failed to allege the necessary facts to bring this suit: based on their status as citizens or taxpayers or bondholders; based on any alleged contractual or impairment claim; or on any other basis establishing their right to bring such claim against defendants." In addition, defendants also claimed that plaintiffs failed to state a claim for relief. Plaintiffs and defendants both filed motions for summary judgment.

The trial court merged its consideration of defendants' motion to dismiss and motion for summary judgment, then granted summary judgment for defendants while denying summary judgment for plaintiffs. Plaintiffs appealed, and on 20 September 2005, a unanimous panel of the Court of Appeals affirmed the trial court "to the extent that the trial court's order is a dismissal for lack of standing." *Goldston v. State*, 173 N.C. App. 416, 422, 618 S.E.2d 785, 790 (2005). Plaintiffs appealed to this Court, and on 2 March 2006, we allowed defendants' motion to dismiss plaintiffs' appeal based on a constitutional question but allowed plaintiffs' petition for discretionary review of the Court of Appeals decision as to the issue of standing. 360 N.C. 363, 629 S.E.2d 850 (2006).

In their briefs, the parties discuss distinctions between "constitutional standing," "direct standing," and "derivative standing" that have never been recognized by this Court. While we do not now pass on the validity of these classifications, we believe that the issue presented in this case can be resolved by reference to our existing case law.

This Court has stated that " '[t]he "gist of the question of standing" is whether the party seeking relief has "alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions." ' " *Stanley v. Dep't of Conservation & Dev.*, 284 N.C. 15, 28, 199 S.E.2d 641, 650 (1973) (quoting *Flast v. Cohen*, 392 U.S. 83, 99, 20 L. Ed. 2d 947, 961 (1968) (citation omitted)). We rec-

GOLDSTON v. STATE

[361 N.C. 26 (2006)]

ognized as early as the nineteenth century that taxpayers have standing to challenge the allegedly illegal or unconstitutional disbursement of tax funds by local officials. In *Stratford v. City of Greensboro*, a taxpayer sought to enjoin Greensboro city authorities from street construction that the taxpayer alleged was undertaken for the benefit of a private citizen rather than for the benefit of the public. 124 N.C. 110, 111-12, 124 N.C. 127, 128-30, 32 S.E. 394, 395 (1899). We found " 'no serious question' " that a taxpayer had an equitable right to sue " 'to prevent an illegal disposition of the moneys of the county.' " *Id.* at 114, 124 N.C. at 134, 32 S.E. at 396-97 (quoting *Crampton v. Zabriskie*, 101 U.S. 601, 609, 25 L. Ed. 1070, 1071 (1879)). We observed that "[i]f such rights were denied to exist against municipal corporations, then taxpayers and property owners who bear the burdens of government would not only be without remedy, but be liable to be plundered whenever irresponsible men might get into the control of the government of towns and cities." *Id.* at 114, 124 N.C. at 133-34, 32 S.E. at 396.

Later, in *Freeman v. Board of County Commissioners*, we considered taxpayer actions against county officials. 217 N.C. 209, 7 S.E.2d 354 (1940). In that case, two taxpayers sought an injunction to prevent a board of county commissioners from "making illegal disbursements of public funds by the payment of salaries to unauthorized persons." *Id.* at 212, 7 S.E.2d at 357. Before addressing the merits, we determined that "[f]or this purpose the plaintiffs have a standing in court as parties with a legal interest in the controversy." *Id.* Similarly, in *McIntyre v. Clarkson*, a taxpayer challenged the constitutionality of a statute providing for the appointment of justices of the peace and for payment of their salaries from the general fund of the county. 254 N.C. 510, 513, 119 S.E.2d 888, 890 (1961). Although the defendants argued that the taxpayer did not have a sufficient interest in the controversy to maintain an action for himself and others similarly situated, we concluded the taxpayer had standing, observing that "this Court has in numerous cases determined the constitutionality of statutes upon suit for injunctive relief by taxpayers where the expenditure of public funds is involved." *Id.*

More recently, in *Lewis v. White*, we addressed taxpayer actions against state officials. 287 N.C. 625, 216 S.E.2d 134 (1975), *superceded by statute*, Environmental Policy Act, N.C.G.S. § 113A-4, *as recognized in Charlotte-Mecklenburg Hosp. Auth. v. N.C. Indus. Comm'n*, 336 N.C. 200, 443 S.E.2d 716 (1994). There, taxpayers sued the Art Museum Building Commission, a state agency, alleging that

the Commission's members exceeded their statutory authority in numerous ways, including failure to comply with the Executive Budget Act in expending funds related to constructing a proposed State Art Museum Building. *Id.* at 629, 216 S.E.2d at 137. Although the defendants claimed sovereign immunity should protect them from suit, we held "[t]he proceeds of State tax levies appropriated by the General Assembly for one purpose may not lawfully be disbursed by State officers for a different purpose and a citizen and taxpayer of the State may sue to restrain such illegal diversion of public funds." *Id.* at 644, 216 S.E.2d at 146. A taxpayer's right to seek equitable relief " 'to enjoin the governing body of a municipal corporation *from transcending their lawful powers* or violating their legal duties in any mode which will injuriously affect the taxpayers—such as making an unauthorized appropriation of the corporate funds, or an illegal or wrongful disposition of the corporate property, etc.,—is well settled.' " *Id.* (quoting *Merrimon v. S. Paving & Constr. Co.*, 142 N.C. 427, 431-32, 142 N.C. 539, 545-46, 55 S.E. 366, 367-68 (1906) (comparing the right of taxpayers to sue government officials for illegal disbursements with right of shareholders of a corporation to bring *ultra vires* shareholder suits)).

In a case strikingly similar to the case at bar, we found taxpayer standing when the challenge involved the allegedly illegal diversion of public funds away from highway construction. In *Teer v. Jordan*, the defendants were members of the State Highway and Public Works Commission. 232 N.C. 48, 59 S.E.2d 359 (1950). The General Assembly authorized and the voters approved the issuance of $200,000,000 in State bonds " 'exclusively for . . . secondary roads.' " *Id.* at 49, 59 S.E.2d at 360. The plaintiff was a "resident and taxpayer of Durham County" who operated motor vehicles "over and along the roads of the County and State" and was "subject to the gallonage tax on motor fuels." *Id.* Alleging that the defendants, as chairman and members of the State Highway and Public Works Commission, were "illegally diverting the proceeds of the bond issue, which was to be devoted exclusively to the construction or improvement of secondary roads, to the purchase of machinery and equipment in the amount of $5,000,000," the plaintiff sought a restraining order. *Id.* at 49-50, 59 S.E.2d at 361.

The defendants argued the plaintiff lacked standing to bring the suit. *Id.* at 50, 59 S.E.2d at 361. We disagreed. "[W]e are not disposed to deny the right of an individual who is one of those for whose benefit the law was enacted to be heard on allegations of an illegal diver-

sion of public funds which may in some degree injuriously affect his rights as a citizen, taxpayer, and user of secondary public roads." *Id.* at 51, 59 S.E.2d at 362. An unlawful diversion of funds "might result in the diminution of the amount allocated" to the roads in the taxpayer's county. *Id.* Although we cautioned that government agencies should not be hindered by lawsuits from taxpayers who merely disagree with the policy decisions of government officials, we concluded that "the right of a citizen and taxpayer to maintain an action in the courts to restrain the unlawful use of public funds to his injury cannot be denied." *Id.* (citing, *inter alia, Freeman,* 217 N.C. 209, 7 S.E.2d 354 (1940)).

Thus, our cases demonstrate that a taxpayer has standing to bring an action against appropriate government officials for the alleged misuse or misappropriation of public funds. Accordingly, plaintiffs were properly before the trial court.

We next consider the form of relief sought by plaintiffs, who filed a declaratory judgment action under the North Carolina Uniform Declaratory Judgment Act (NCUDJA). N.C.G.S. §§ 1-253 to -267 (2005). The North Carolina Constitution provides that "every person for an injury done him in his lands, goods, person, or reputation shall have remedy by due course of law." N.C. Const. Art. I, § 18. Consistent with this mandate, the NCUDJA provides "[a]ny person . . . whose rights, status or other legal relations are affected by a statute . . . may have determined any question of construction or validity arising under the . . . statute . . . and obtain a declaration of rights, status, or other legal relations thereunder." N.C.G.S. § 1-254. "A declaratory judgment may be used to determine the construction and validity of a statute." *Town of Emerald Isle v. State,* 320 N.C. 640, 646, 360 S.E.2d 756, 760 (1987).

Although a declaratory judgment action must involve an "actual controversy between the parties," plaintiffs are "not required to allege or prove that a traditional 'cause of action' exists against defendant[s] in order to establish an actual controversy." *Id.* (citations omitted). "[A] declaratory judgment should issue '(1) when [it] will serve a useful purpose in clarifying and settling the legal relations at issue, and (2) when it will terminate and afford relief from the uncertainty, insecurity and controversy giving rise to the proceeding." *Augur v. Augur,* 356 N.C. 582, 588, 573 S.E.2d 125, 130 (2002) (quoting Edwin Borchard, *Declaratory Judgments* 299 (2d ed. 1941)) (alterations in original); *see also* N.C.G.S. § 1-257 (2005).

Taxpayers in this state have a valid interest in the building and maintenance of roads and highways across North Carolina. Plaintiffs here are similar to the taxpayer plaintiffs in *Teer*, *Lewis*, and other cases discussed above. Their claim of illegal and unconstitutional diversion of funds derived from taxes paid by plaintiffs and others similarly situated is an actual controversy between the parties. A declaratory judgment would serve to clarify and settle the legal rights and responsibilities of the Governor and the General Assembly, as well as the legal status of the taxpayer funds in the Highway Trust Fund. A declaratory judgment also would terminate the uncertainty and controversy giving rise to the action. Accordingly, taxpayers have standing to seek equitable relief and a declaratory judgment when alleging government officials violated statutory or constitutional provisions by diverting tax levies appropriated for one purpose but disbursed for another.

Although plaintiffs originally sought to compel return of the challenged assets to the Trust Fund, they later abandoned that portion of their claim. In other words, plaintiffs are now seeking to obtain a declaration by a court that defendants acted illegally without also seeking additional redress for the wrong. In so doing, plaintiffs contend they will deter future similar actions by the State. We now consider whether plaintiffs may seek only this limited remedy.

Declaratory relief "does not seek execution or performance from the defendant or opposing party." *Declaratory Judgments* at 25 (citing, *inter alia*, N.C.G.S. § 1-253) (noted to be the "preeminent treatise on declaratory judgments," *Auger*, 356 N.C. at 588, 573 S.E.2d at 130). Although a declaratory judgment can seek an executory or coercive decree, *id.* at 26, in some instances "the simple declaratory adjudication of the illegality of the act complained of [is] the most assured and effective remedy available," *id.* at 884. Indeed, "a citizen seeking a declaration of the illegality" of a governmental act "often finds himself enmeshed in the intricacies of certiorari, injunction, mandamus, quo warranto, habeas corpus, or prohibition" and "has often been forced into a mystic maze," when the citizen sought nothing more than to ascertain whether a government action "is valid or not, or, if valid, what it means." *Id.* at 875. "The reluctance of courts to mandamus or enjoin officials, often for sound reasons, is an indication of their special position—a fact which makes a declaration of their duty as effective as a command to perform it or an injunction not to transgress." *Id.* at 876.

Accordingly, declaratory judgment remains an appropriate remedy here. A declaration as to the legality and constitutionality of the Governor's and the General Assembly's diversions from the Trust Fund may well be "the most assured and effective remedy available." If plaintiffs ultimately prevail, their point is made. Similar future diversions will be obviated without requiring that the State undertake substantial and undoubtedly disruptive budgetary gyrations necessary to return immediately the funds at issue. If plaintiffs do not prevail, the Governor and the General Assembly will have done no harm.

We observe that, in finding plaintiffs lack standing to bring their claims against the Governor and the General Assembly, the Court of Appeals relied upon federal standing doctrine. *Goldston*, 173 N.C. App. 416 *passim*, 618 S.E.2d 785 *passim* (citing *Neuse River Found., Inc. v. Smithfield Foods, Inc.*, 155 N.C. App. 110, 574 S.E.2d 48 (2002) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 119 L. Ed. 2d 351 (1992)), *disc. rev. denied*, 356 N.C. 675, 577 S.E.2d 628 (2003); *id.* at 419, 618 S.E.2d at 788 (quoting *Neuse River Found.*, 155 N.C. App. at 114, 574 S.E.2d at 52 (quoting *Lujan*, 504 U.S. at 550-61, 119 L. Ed. 2d at 364)). This reliance was misplaced. While federal standing doctrine can be instructive as to general principles (as in our previous reference to *Flask v. Cohen*) and for comparative analysis, the nuts and bolts of North Carolina standing doctrine are not coincident with federal standing doctrine. *Compare Piedmont Canteen Serv., Inc. v. Johnson*, 256 N.C. 155, 166, 123 S.E.2d 582, 589 (1962) ("Only those persons may call into question the validity of a statue who have been *injuriously affected* thereby in their persons, property or constitutional rights." (emphasis added)), *with Lujan v. Defenders of Wildlife*, 504 U.S. at 560, 119 L. Ed. 2d at 364 (noting that one of the three elements of federal standing is an " 'injury in fact' " that is "concrete and particularized").

Finally, we express no opinion as to the legality or constitutionality of the Governor's and the General Assembly's diversions of a total of $205,000,000 from the Trust Fund to the General Fund. Instead, we hold only that these taxpayers, like the taxpayers in *Teer* and *Lewis*, have standing to challenge the government expenditures as illegal or unconstitutional. "The burden is upon the plaintiffs to prove the alleged violations or proposed violations of the law by the defendants. When given the opportunity to present their evidence in support of their allegations, they may or may not 'get to first base,' but they are entitled to their turn at bat, which right the judgment of

the Superior Court erroneously denied them." *Lewis*, 287 N.C. at 644-45, 216 S.E.2d at 147.

The Court of Appeals is reversed. The case is remanded to the Court of Appeals for further remand to the trial court.

REVERSED and REMANDED.

Justices MARTIN and TIMMONS-GOODSON did not participate in the consideration or decision of this case.

Chief Justice PARKER dissenting.

In my view, plaintiffs lack standing to maintain an action under the Uniform Declaratory Judgment Act, N.C.G.S. §§ 1-253 to -267.

This Court has noted that jurisdiction under the Declaratory Judgment Act

> may be invoked "only in a case in which there is an actual or real existing controversy between parties having adverse interests in the matter in dispute." *Lide v. Mears*, 231 N.C. 111, 56 S.E.2d 404, and cases cited. It must appear that "a real controversy, arising out of their opposing contentions as to their respective legal rights and liabilities under a deed, will or contract in writing, or under a statute, municipal ordinance, contract or franchise, exists between or among the parties, . . ." *Light Co. v. Iseley*, 203 N.C. 811, 167 S.E. 56. The existence of such genuine controversy between parties having conflicting interests is a "jurisdictional necessity." *Tryon v. Power Co.*, 222 N.C. 200, 22 S.E.2d 450.

> "It is no part of the function of the courts, in the exercise of the judicial power vested in them by the Constitution, to give advisory opinions, . . ." *Stacy, C.J.*, in *Poore v. Poore*, 201 N.C. 791, 161 S.E. 532. "The statute (G.S. 1-253 *et seq.*) does not require the Court to give a purely advisory opinion which the parties might, so to speak, put on ice to be used if and when occasion might arise." *Seawell, J.*, in *Tryon v. Power Co., supra*. "The Uniform Declaratory Judgment Act does not license litigants to fish in judicial ponds for legal advice." *Ervin, J.*, in *Lide v. Mears, supra*. Also, see *Calcutt v. McGeachy*, 213 N.C. 1, 195 S.E. 49; *Trust Co. v. Whitfield*, 238 N.C. 69, 76 S.E.2d 334, and *NASCAR, Inc. v. Blevins*, 242 N.C. 282, 87 S.E.2d 490.

The validity of a statute, when *directly and necessarily* involved, *Person v. Watts*, 184 N.C. 499, 115 S.E. 336, may be determined in a properly constituted action under G.S. 1-253 *et seq.*, *Calcutt v. McGeachy*, *supra*; but this may be done only when some specific provision(s) thereof is challenged by a person who is directly and adversely affected thereby. Compare *Fox v. Comrs. of Durham*, 244 N.C. 497, 94 S.E.2d 482.

*City of Greensboro v. Wall*, 247 N.C. 516, 519-20, 101 S.E.2d 413, 416 (1958). Further,

a declaratory judgment should issue "(1) when [it] will serve a useful purpose in clarifying and settling the legal relations at issue, and (2) when it will terminate and afford relief from the uncertainty, insecurity and controversy giving rise to the proceeding." When these criteria are not met, no declaratory judgment should issue. Thus, declaratory judgments should not be made " 'in the air,' or in the abstract, *i.e.* without definite concrete application to a particular state of facts which the court can by the declaration control and relieve and thereby settle the controversy."

*Augur v. Augur*, 356 N.C. 582, 588, 573 S.E.2d 125, 130 (2002) (citing and quoting Edwin Borchard, *Declaratory Judgments* 299, 306 (2d ed. 1941)). The Court in *Augur* also noted the language in N.C.G.S. § 1-257 allowing a trial court the discretion to refuse to issue a declaratory judgment when such relief " 'would not terminate the uncertainty or controversy giving rise to the proceeding.' " *Id.* at 587-88, 573 S.E.2d at 130 (quoting N.C.G.S. § 1-257 (2001)). Although the Declaratory Judgment Act does not include a specific requirement of an actual controversy between the parties, as the above cited cases amply demonstrate, North Carolina case law imposes such a requirement. *See Sharpe v. Park Newspapers of Lumberton, Inc.*, 317 N.C. 579, 583, 347 S.E.2d 25, 29 (1986) (citing *Gaston Bd. of Realtors, Inc. v. Harrison*, 311 N.C. 230, 234, 316 S.E.2d 59, 61 (1984)).

Generally,

[a] case is considered moot when "a determination is sought on a matter which, when rendered, cannot have any practical effect on the existing controversy." *Roberts v. Madison Cty. Realtors Ass'n*, 344 N.C. 394, 398-99, 474 S.E.2d 783, 787 (1996). Courts will not entertain such cases because it is not the responsibility of courts to decide "abstract propositions of law." *In re*

*Peoples,* 296 N.C. 109, 147, 250 S.E.2d 890, 912 (1978), *cert. denied,* 442 U.S. 929, 61 L. Ed. 2d 297 (1979).

*Lange v. Lange,* 357 N.C. 645, 647, 588 S.E.2d 877, 879 (2003). A controversy must exist between the parties both at the time the complaint is filed and at the time of hearing. *See Sharpe,* 317 N.C. at 585-86, 347 S.E.2d at 30. Although "[i]t is not necessary for one party to have an actual right of action against another for an actual controversy to exist which would support declaratory relief[,] it is necessary that the Courts be convinced that the litigation appears to be unavoidable." *N.C. Consumers Power, Inc. v. Duke Power Co.,* 285 N.C. 434, 450, 206 S.E.2d 178, 189 (1974) (citing 22 Am. Jur. 2d *Declaratory Judgments* § 11 (1965)).

The cases cited by plaintiffs to support standing involve challenges to *prospective* misuse of tax money or public property. *See Lewis v. White,* 287 N.C. 625, 644-45, 216 S.E.2d 134, 146-47 (1975) (holding that citizens could bring an action to prevent the construction of a "Cultural Complex" with tax funds appropriated solely for the purpose of building an art museum), *superseded on other grounds by statute,* North Carolina Environmental Policy Act of 1971, *codified as* N.C.G.S. §§ 113A-1 to -10, *as recognized in Corum v. Univ. of N.C.,* 330 N.C. 761, 786, 413 S.E.2d 276, 292, *cert. denied,* 506 U.S. 985, 121 L. Ed. 2d 431 (1992); *Shaw v. City of Asheville,* 269 N.C. 90, 95-96, 152 S.E.2d 139, 143-44 (1967) (holding that citizens and taxpayers of a municipality had standing to bring a suit challenging the validity of an agreement between a municipality and a cable company because the taxpayers could incur significant expense to repair uncompleted work if the agreement was later determined to be void); *Wishart v. City of Lumberton,* 254 N.C. 94, 96, 118 S.E.2d 35, 36 (1961) (holding that a municipality's citizens and taxpayers had standing to seek an injunction prohibiting the municipality from abandoning and converting to a different use land set aside as a public park).

In this case, however, the challenged governmental action has already occurred. Plaintiffs' complaint alleges that two transfers from the Highway Trust Fund to the General Fund constituted unlawful disbursements contrary to the stated purposes in the relevant statute. Plaintiffs initially sought mandamus relief ordering all transfers be returned to the Highway Trust Fund but withdrew this claim and presently seek only a declaration of the illegality of those *past* transfers.

**GOLDSTON v. STATE**

[361 N.C. 26 (2006)]

This Court has previously addressed taxpayer standing to challenge a legislative act. *See Nicholson v. State Educ. Assistance Auth.*, 275 N.C. 439, 168 S.E.2d 401 (1969). In *Nicholson*, this Court noted that it

> will not determine the constitutionality of a legislative provision in a proceeding in which there is no "actual antagonistic interest in the parties." *Bizzell v. Insurance Co.*, 248 N.C. 294, 103 S.E.2d 348. "Only one who is in immediate danger of sustaining a direct injury from legislative action may assail the validity of such action. It is not sufficient that he has merely a general interest common to all members of the public." *Charles Stores v. Tucker*, 263 N.C. 710, 140 S.E.2d 370.

*Id.* at 447, 168 S.E.2d at 406. The Court also addressed the standing of taxpayers generally:

> A taxpayer, as such, does not have standing to attack the constitutionality of any and all legislation. *Wynn v. Trustees*, 255 N.C. 594, 122 S.E.2d 404; *Carringer v. Alverson*, 254 N.C. 204, 118 S.E.2d 408; *Fox v. Commissioners of Durham, supra; Turner v. Reidsville, supra*. A taxpayer, as such, may challenge, by suit for injunction, the constitutionality of a tax levied, or proposed to be levied, upon him for an illegal or unauthorized purpose. *See: Wynn v. Trustees, supra; Barbee v. Comrs. of Wake*, 210 N.C. 717, 188 S.E. 314. The constitutionality of a provision of a statute may not, however, be tested by a suit for injunction unless the plaintiff alleges, and shows, that the carrying out of the provision he challenges will cause him to sustain, personally, a direct and irreparable injury, apart from his general interest as a citizen in good government in accordance with the provisions of the Constitution. *D & W, Inc. v. Charlotte*, 268 N.C. 577, 151 S.E.2d 241; *Watkins v. Wilson, supra; Fox v. Commissioners of Durham, supra; Sprunt v. Comrs. of New Hanover*, 208 N.C. 695, 182 S.E. 655; *Newman v. Comrs. of Vance*, 208 N.C. 675, 182 S.E. 453.

*Id.* at 447-48, 168 S.E.2d at 406.

In *Stanley*, cited in the majority, this Court distinguished the case before it from *Nicholson* on "factual and procedural differences," specifically that the plaintiff in *Nicholson* sought an injunction and nullification of prior transactions involving the defendant agency, and that the Court there ruled that plaintiff "showed no threat of

immediate irremediable injury to him," and was, therefore, not entitled to injunctive relief. *Stanley v. Department of Conservation & Dev.*, 284 N.C. 15, 30-31, 199 S.E.2d 641, 651-52 (1973). Thus, the plaintiffs in *Stanley*, a case in which the allegedly unconstitutional actions had not yet occurred, had standing.

Although plaintiffs alleged that defendants "threatened" future withdrawals from the Trust Fund, they acknowledged the General Assembly's authority to "enact new legislation relating to collection [of] taxes prospectively and appropriate prospectively expenditures." Plaintiffs alleged that their claims related to "unlawful and unconstitutional spending of Highway Trust Funds for purposes not specified by tax laws *at the time of collection* as required by the Constitution and the threat of future misappropriation." (Emphasis added.)

Nothing in the record, however, suggests that future action by the Governor or the General Assembly would give rise to a controversy rendering litigation unavoidable. If any future transfers from the Highway Trust Fund to the General Fund are contemplated, the General Assembly could, as conceded by plaintiffs, enact legislation authorizing such transfers. The judgment sought by plaintiffs will do nothing to settle any existing controversy, and any judgment issued in this matter constitutes an advisory opinion. The Declaratory Judgment Act does "not undertake to convert judicial tribunals into counsellors and impose upon them the duty of giving advisory opinions to any parties who may come into court and ask for either academic enlightenment or practical guidance concerning their legal affairs." *Lide v. Mears*, 231 N.C. 111, 117, 56 S.E.2d 404, 409 (1949).

The Court of Appeals below correctly held that the authority cited by plaintiffs as grounds for what they termed "constitutional standing" does "not authorize citizens to sue for a court declaration that past government action, and unthreatened recurrences, are unlawful." *Goldston v. State*, 173 N.C. App. 416, 420, 618 S.E.2d 785, 789 (2005).

For the foregoing reasons, I respectfully dissent.