JASON R. SAINE AND DONALD REID, PLAINTIFFS v. STATE OF NORTH CAROLINA; BEVERLY PERDUE, GOVERNOR OF THE STATE OF NORTH CAROLINA, IN HER OFFICIAL CAPACITY; J. KEITH CRISCO, SECRETARY OF THE NORTH CAROLINA DEPARTMENT OF COMMERCE, IN HIS OFFICIAL CAPACITY; AND JOHNSON AND WALES UNIVERSITY, DEFENDANTS

No. COA10-832

(Filed 5 April 2011)

**1. Taxation— General Assembly disbursement of funds— directly to private entity—not required to comply with statute**

The General Assembly was not required to follow the statutory guidelines pertaining to the allocation of funds from the One North Carolina Fund as set out in N.C.G.S. § 143B-437.70, *et seq.* when it granted funds directly to Johnson and Wales University.

**2. Taxation— General Assembly disbursement of funds— private entity—public purpose**

The trial court did not err by granting defendants' motion to dismiss plaintiffs' claim that the General Assembly's allocation of funds to Johnson and Wales University did not serve a public purpose and that the Session Laws which provided such funds were unconstitutional. Plaintiffs failed to plead facts demonstrating that the motivation, aim, or intent of the legislation was not a public one.

**3. Taxation— General Assembly disbursement of funds— private entity—not exclusive emoluments**

The trial court did not err by granting defendants' motion to dismiss plaintiffs' claim that funds provided to Johnson and Wales University via five session laws constituted exclusive emoluments and were unconstitutional. Because the session laws served a public purpose, they were not providing exclusive emoluments and were, therefore, not unconstitutional on that ground.

**4. Taxation— General Assembly disbursement of funds— private entity constitutional challenge—taxpayers lacked standing**

The trial court properly dismissed count three of plaintiffs' complaint concerning the General Assembly's granting of funds to Johnson and Wales University. Plaintiffs failed to identify any class to which they belonged which could have been prejudiced by the session laws other than their status as taxpayers and, thus, plaintiffs did not have standing to bring their constitutional challenge.

Appeal by plaintiffs from order entered 4 March 2010 by Judge Michael R. Morgan in Wake County Superior Court. Heard in the Court of Appeals 10 January 2011.

*North Carolina Institute for Constitutional Law, by Robert F. Orr and Jeanette Doran, for plaintiffs-appellants.*

*Attorney General Roy Cooper, by Special Deputy Attorney General Norma S. Harrell, for defendants-appellees State of North Carolina, Beverly Perdue, and J. Keith Crisco.*

*Nelson Mullins Riley & Scarborough LLP, by Reed Hollander, for defendant-appellee Johnson and Wales University.*

HUNTER, Robert C., Judge.

Jason R. Saine and Donald Reid ("plaintiffs") appeal from the trial court's order granting the State of North Carolina, Beverly Perdue, J. Keith Crisco, and Johnson and Wales University's ("defendants") motion to dismiss the allegations in plaintiffs' complaint. After careful review, we affirm.

## Background

In 2003, the General Assembly passed Session Law 2003-284, which was the first of five session laws allocating funds from the State's One North Carolina Fund to Johnson and Wales University, a private, non-profit university located in Charlotte, North Carolina.[1] Session Law 2003-284 granted $1,000,000.00 to Johnson and Wales for the 2003-2004 fiscal year and an additional $1,000,000.00 for the 2004-2005 fiscal year. The General Assembly stated in general terms that the allocation was meant "to provide financial assistance to Johnson and Wales University." The General Assembly further set out a more detailed purpose for the grant as follows:

.    The General Assembly finds that institutions of higher education play an essential role in maintaining and strengthening the economic health of the State. As our economy evolves from its traditional manufacturing and agricultural base to a diverse structure, including many technology, information, and service-based businesses, innovative educational institutions are essential to pro-

---

1. At that time, the One North Carolina Fund was known as the One North Carolina Industrial Recruitment Competitive Fund. Session Law 2004-88, which became effective 30 June 2004, codified the parameters that currently exist for the One North Carolina Fund in N.C. Gen. Stat. § 143B-437.70, *et seq.* (2009).

viding appropriate workforce preparation and training to maintain the State's viability as an attractive location for new and expanding businesses. Recruiting new educational institutions to the State to fulfill this role also benefits the State and local governments by providing new jobs, a stronger tax base, support for satellite businesses, and investment that will permanently enhance the infrastructure necessary to support long-term growth and prosperity. The General Assembly recognizes that the significant efforts by Johnson and Wales University to establish and expand in North Carolina are vital to a healthy and growing State economy. Providing incentives to support these activities is a critical opportunity for our State to address the possibly irreversible damage from the current economic recession and restructuring.

The General Assembly specified in the session law that the funds were to be used

only for one or more of the following capital expenditures: (1) Installation or purchase of equipment for educational facilities in this State; (2) Structural repairs, improvements, or renovations of existing academic buildings in this State to be used for expansion; (3) Construction of or improvements to new or existing water, sewer, gas, or electric utility distribution lines or equipment for new or existing academic facilities in this State; [and] (4) Construction of new academic facilities in this State.

The General Assembly subsequently passed four additional session laws granting funds to Johnson and Wales from the One North Carolina Fund: Session Law 2005-276 allocated $1,000,000.00 for the 2005-2006 fiscal year; Session Law 2006-66 allocated $1,000,000.00 for the 2006-2007 fiscal year; Session Law 2007-323 allocated $2,000,000.00 by reference to The Joint Conference Committee Report on the Continuation, Expansion and Capital Budgets ("Committee Report") dated 27 July 2007; and Session Law 2008-107 allocated $1,500,000.00 by reference to the Committee Report dated 3 July 2008. Although the detailed purpose for the allocations as originally set out in Session Law 2003-284 was not repeated in the subsequent session laws, Session Laws 2005-276 and 2006-66 stated that the funds were allocated "[n]otwithstanding the provisions of G.S. 143B-437.71 . . . for the purpose of providing financial assistance to the University."[2] The Committee Reports referenced by Session Laws 2007-323 and 2008-

_____

2. N.C. Gen. Stat. § 143B-437.71 (2009) sets out, *inter alia*, how funds from the One North Carolina Fund must be utilized by local governments that receive the funds.

107 stated that the funds were to be paid "to Johnson and Wales University in Charlotte, a private university that specializes in the culinary and hospitality industries." No conditions were placed on the use of the funds allocated by these four session laws.

On 16 September 2009, plaintiffs, who are tax-paying citizens of North Carolina, filed a Complaint and Petition for Declaratory Judgment alleging that the State had committed multiple constitutional violations by providing funds collected from the taxpayers of North Carolina to Johnson and Wales. Count one alleged that the allocation of funds violated Article I, § 32 of the North Carolina Constitution because the "private financial benefit" to Johnson and Wales constituted an exclusive and separate emolument. Count two alleged that the allocation of funds violated Article IV, § 2(1) of the North Carolina Constitution "in that the benefits, grants and/or subsidies provided to Johnson and Wales . . . are not for 'public purposes only.' " Count three alleged that the allocation of funds violated Article I, § 19 of the North Carolina Constitution as plaintiffs' equal protection rights were violated. Count Four alleged that the grants are ongoing and plaintiffs "are entitled to a declaration" that all future grants to Johnson and Wales are "unconstitutional and thus unlawful."

On 16 November 2009, defendants filed a motion to dismiss plaintiffs' claims pursuant to Rules 12(b)(1) and 12(b)(6) of the North Carolina Rules of Civil Procedure. On 4 March 2010, after a hearing was conducted, the trial court issued a written order in which it granted defendants' motion to dismiss. The trial court dismissed counts one, two, and four pursuant to Rule 12(b)(6) for failure to state a claim upon which relief may be granted. The trial court dismissed count three pursuant to Rule 12(b)(1) for lack of standing. Plaintiffs timely appealed to this Court.

## Standard of Review

The standard of review on a motion to dismiss under Rule 12(b)(6) is "whether, if all the plaintiff's allegations are taken as true, the plaintiff is entitled to recover under some legal theory." *Toomer v. Garrett*, 155 N.C. App. 462, 468, 574 S.E.2d 76, 83 (2002). "The standard of review on a motion to dismiss under Rule 12(b)(1) is *de novo*." *Rowlette v. State*, 188 N.C. App. 712, 714, 656 S.E.2d 619, 621, *appeal dismissed and disc. review denied*, 362 N.C. 474, 666 S.E.2d 487 (2008).

## Discussion

[1] As a preliminary matter, plaintiffs raise two issues that are not relevant to their constitutional claims. First, plaintiffs allege that certain members of the General Assembly and former Governor Mike Easley personally promised funds to Johnson and Wales. Any such promises do not bear on the constitutionality of the actions of the General Assembly in enacting the five session laws at issue.

Second, without relating the argument to their constitutional claims, plaintiffs repeatedly assert, and the State does not refute, that the General Assembly did not follow the statutory guidelines pertaining to the allocation of funds from the One North Carolina Fund as set out in N.C. Gen. Stat. § 143B-437.70, *et seq.*

N.C. Gen. Stat. § 143B-437.72 (2009) establishes the method by which the State disburses funds from the One North Carolina Fund as follows: "Funds may be disbursed from the One North Carolina Fund only in accordance with agreements entered into between the State and one or more local governments and between the local government and a grantee business." As stated *supra*, N.C. Gen. Stat. § 143B-437.71 sets out the purposes for which the funds must be used by the local government. In addition to listing four specific purposes, N.C. Gen. Stat. § 143B-437.71(b)(5) states that the funds may be used for "[a]ny other purposes specifically provided by an act of the General Assembly."

In the present case, the funds were granted directly to Johnson and Wales from the General Assembly as opposed to passing the funds through the local government with restrictions on how it may be used.[3] We must presume that when the legislature enacted the session laws at issue, it "acted with full knowledge of prior and existing law . . . ." *State ex rel. Cobey v. Simpson,* 333 N.C. 81, 90, 423 S.E.2d 759, 763 (1992). Moreover, although the General Assembly established a method for disbursement of funds, these statutes do not prevent the General Assembly from passing session laws that provide a direct grant of funds from the One North Carolina Fund to a business entity without restrictions so long as that action is constitutional. "The power of the General Assembly to pass all needful laws, except when barred by constitutional restrictions, is plenary[.]" *Town of Shelby v. Cleveland Mill & Power Co.,* 155 N.C. 196, —, 71 S.E. 218, 219-20 (1911).

---

3. Session Laws 2005-276 and 2006-66 specifically stated that the grant was made "notwithstanding" N.C. Gen. Stat. § 143B-437.71.

[I]t is firmly established that our State Constitution is not a grant of power. All power which is not expressly limited by the people in our State Constitution remains with the people, and an act of the people through their representatives in the legislature is valid unless prohibited by that Constitution.

*State ex rel. Martin v. Preston,* 325 N.C. 438, 448-49, 385 S.E.2d 473, 478 (1989) (internal citation omitted). Accordingly, while a local government must abide by the statutes of the General Assembly, the General Assembly is not bound by its previous legislation. Having determined that the General Assembly was not bound by the statutes pertaining to the One North Carolina Fund, we now turn our focus to the substantive constitutional issues in this case.

## I. Count Two—The Public Purpose Clause

[2] Plaintiffs allege that the allocation of funds to Johnson and Wales did not serve a public purpose and, therefore, the Session Laws which provided such funds are unconstitutional. The trial court dismissed this claim pursuant to Rule 12(b)(6). We first address whether the funds granted pursuant to Session Law 2003-284, which set out in detail the reason for its enactment, serves a public purpose.

Article V, § 2(1) of the North Carolina Constitution provides that "[t]he power of taxation shall be exercised in a just and equitable manner, for public purposes only and shall never be surrendered, suspended, or contracted away." "The power to appropriate money *from* the public treasury is no greater than the power to levy the tax which put the money in the treasury." *Mitchell v. Financing Authority,* 273 N.C. 137, 143, 159 S.E.2d 745, 749-50 (1968).

In determining whether legislation serves a public purpose, *the presumption favors constitutionality.* Reasonable doubt must be resolved in favor of the validity of the act. The Constitution restricts powers, and powers not surrendered inhere in the people to be exercised through their representatives in the General Assembly; therefore, so long as an act is not forbidden, its wisdom and expediency are for legislative, not judicial, decision.

*Maready v. City of Winston-Salem,* 342 N.C. 708, 714, 467 S.E.2d 615, 619 (1996) (internal citations omitted) (emphasis added); *see Assurance Co. v. Gold, Comr. of Insurance,* 249 N.C. 461, 462-63, 106 S.E.2d 875, 876 (1959) ("When called upon to pass on the constitutionality of a statute, it is assumed that the Legislature has not trespassed on forbidden

territory delineated by the people by constitutional restrictions. Every presumption favors the validity of a statute.").[4]

"The initial responsibility for determining what constitutes a public purpose rests with the legislature, and its determinations are entitled to great weight." *Maready*, 342 N.C. at 714, 467 S.E.2d at 619. Nevertheless,

> [w]hile legislative declarations such as these are accorded great weight, ultimate responsibility for the public purpose determination rests with this Court. If an enactment is for a private purpose and therefore inconsistent with the fundamental law, it cannot be saved by legislative declarations to the contrary. It is the duty of this Court to ascertain and declare the intent of the framers of the Constitution and to reject any act in conflict therewith.

*Id.* at 716, 467 S.E.2d at 620 (internal citation omitted).

Our Supreme Court has addressed what constitutes a public purpose on numerous occasions, but it has not specifically defined "public purpose"; rather, it has expressly declined to "confine public purpose by judicial definition[, leaving] 'each case to be determined by its own peculiar circumstances as from time to time it arises.' " *Stanley, Edwards, Henderson v. Dept. Conservation & Development*, 284 N.C. 15, 33, 199 S.E.2d 641, 653 (1973) (quoting *Keeter v. Town of Lake Lure*, 264 N.C. 252, 264, 141 S.E.2d 634, 643 (1965)), *disapproved in part on other grounds by Madison Cablevision v. City of Morganton*, 325 N.C. 634, 648, 386 S.E.2d 200, 208 (1989).

> A slide-rule definition to determine public purpose for all time cannot be formulated; the concept expands with the population, economy, scientific knowledge, and changing conditions. As people are brought closer together in congested areas, the public welfare requires governmental operation of facilities which were once considered exclusively private enterprises, and necessitates the expenditure of tax funds for purposes which, in an earlier day, were not classified as public. Often public and private interests are so co-mingled that it is difficult to determine which predominates. It is clear, however, that for a use to be public its benefits must be in common and not for particular persons,

---

4. We recognize at the outset of our analysis that some of the cases cited herein pertain to the issuance of economic incentives to for-profit corporations, as opposed to grants given directly to a non-profit institution. Nevertheless, these cases relate directly to our application of the public purpose doctrine in this case.

interests, or estates; the ultimate net gain or advantage must be the public's as contradistinguished from that of an individual or private entity.

*Mitchell*, 273 N.C. at 144, 159 S.E.2d at 750 (internal citations omitted).

The term "public purpose" is not to be narrowly construed. *Briggs v. City*, 195 N.C. 223, 226, 141 S.E. 597, 599 (1928).

Two guiding principles have been established for determining that a particular undertaking by a municipality [or the State] is for a public purpose: (1) it involves a reasonable connection with the convenience and necessity of the particular municipality [or the State]; and (2) the activity benefits the public generally, as opposed to special interests or persons[.] This has been our traditional test, and we continue to adhere to it. ,

*Madison*, 325 N.C. at 646, 386 S.E.2d at 207.[5] Whether an activity involves a reasonable connection to community needs may be evaluated "by determining how similar the activity is to others which this Court has held to be within the permissible realm of governmental action." *Maready*, 342 N.C. at 722, 467 S.E.2d at 624.

In the present case, the State set out in Session Law 2003-284 that, *inter alia*, "innovative educational institutions are essential to providing appropriate workforce preparation and training to maintain the State's viability as an attractive location for new and expanding businesses." Clearly, the General Assembly sought to increase educational opportunities for North Carolinians in an effort to diversify the skills of the State's workforce and thereby strengthen the State's economy. Johnson and Wales provides education in culinary arts, hospitality, and related fields. As the session law indicates, our State has moved away from "traditional manufacturing and agricultur[e] base[d]" industries and there is, therefore, a need for "innovative

---

5. The *Madison Cablevision* test, as set out in that case, refers to an "undertaking by a municipality" to establish and maintain a cable television system. *Id.* However, the constitutionality of a State statute that permitted the municipality to operate a cable television system was at issue and was deemed to effectuate a public purpose. *Id.* at 652, 386 S.E.2d at 211. The *Madison Cablevision* test has since been applied in other cases to determine whether legislation enacted by the General Assembly is for a public purpose. *Maready*, 342 N.C. at 723-25, 467 S.E.2d at 624-26; *Blinson v. State*, 186 N.C. App. 328, 337, 651 S.E.2d 268, 275 (2007) (relying on *Maready's* application of the *Madison Cablevision* test and holding that the statute at issue was enacted for a public purpose). In other words, the test is not limited to actions of a city or municipality, but is equally applicable to legislation enacted by the General Assembly.

educational institutions" such as Johnson and Wales. Thus, the session law establishes an educational purpose as well as a fiscal purpose since "institutions of higher education play an essential role in maintaining and strengthening the economic health of the State." Session Law 2003-284.

Our Supreme Court has stated that providing State funds to a private educational institution constitutes a public purpose. In *Hughey v. Cloninger*, 297 N.C. 86, 95, 253 S.E.2d 898, 903-04 (1979) (*Hughey I*), the Court held that direct appropriation of funds by Gaston County to a private educational institution which taught dyslexic children was constitutionally permissible, but prohibited by statute in that particular situation. The Court reasoned:

> *[D]irect disbursement* of public funds to private entities is a constitutionally permissible *means* of accomplishing a public purpose provided there is statutory authority to make such appropriation. Had there been such statutory authority in this case the direct appropriation of funds by Gaston County to the Dyslexia School of North Carolina would have presented no "public purpose" difficulties as it is well established that both appropriations and expenditures of public funds for the education of the citizens of North Carolina are for a public purpose.

*Id.* at 95, 253 S.E.2d at 904.

We point out that *this Court* held that pursuant to Article V, § 2(1) of the North Carolina Constitution, the disbursement of taxpayer funds to a private entity was impermissible since it "constitute[d] a primary benefit to the private entity itself." *Hughey v. Cloninger*, 37 N.C. App. 107, 111-12, 245 S.E.2d 543, 547 (1978) (*Hughey II*). The Supreme Court held that, "[t]he constitutional problem under the public purpose doctrine perceived by the Court of Appeals is no longer present in view of the addition, effective 1 July 1973, of subsection (7) to Article V, Section 2 of the North Carolina Constitution." *Hughey I*, 297 N.C. at 95, 253 S.E.2d at 903. Article V, § 2(7) states: "The General Assembly may enact laws whereby the State, any county, city or town, and any other public corporation may contract with and appropriate money to any person, association, or corporation for the accomplishment of public purposes only." The Supreme Court stated that Article V, § 2(7) allows for disbursement of taxpayer funds to private entities. *Hughey I*, 297 N.C. at 95, 253 S.E.2d at 903.

Plaintiffs in the present case cite only Article V, § 2(1) in their complaint; however, in determining whether the funds given to Johnson and Wales were for a public purpose, we must take into account Article V, § 2(7) and the Supreme Court's ruling in *Hughey I*. If the session laws at issue satisfy a public purpose, then they are constitutional under both Article V, §§ 2(1) and 2(7).

Plaintiffs attempt to distinguish *Hughey I*, arguing that the school in *Hughey* was performing a function of the government—to provide education to children—whereas in the present case Johnson and Wales is providing higher education to adults who meet the school's "entrance standards." However, *Hughey I* did not make that distinction. In fact, the Court made clear that the use of public funds to educate the "citizens of North Carolina" is for a public purpose. Arguably, providing dyslexic children an education has a more readily identifiable public purpose; however, that does not mean that supplementing adult education with taxpayer money can never serve a public purpose. To the contrary, education, even if provided by a private entity, may serve a public purpose. *Id.*

Our Supreme Court has further acknowledged the need to promote education generally and held that, "[s]ubject to constitutional limitations, methods to facilitate and achieve the public purpose of providing for the education or training of residents of this State in institutions of higher education or post-secondary schools are for determination by the General Assembly." *Education Assistance Authority v. Bank*, 276 N.C. 576, 587, 174 S.E.2d 551, 559 (1970) (holding that state revenue bonds used to make loans to adult students to further their education served a public purpose). This Court has aptly stated that, "[i]t is declared in both our Constitution and our statutes that the education of our citizens to their maximum capacities is the goal of our educational system, for education of our citizens is essential to good government, morality and a good economy." *Kiddie Korner v. Board of Education*, 55 N.C. App. 134, 145, 285 S.E.2d 110, 117 (1981) (holding that costs to the public school system incurred due to the operation of an after-school program did not violate the Public Purpose Clause).[6]

In addition to the educational benefits to North Carolinians, Session Law 2003-284 sets out a direct connection between education

---

6. Plaintiffs argue that if taxpayer money can be given to Johnson and Wales then the General Assembly is permitted to grant taxpayer money to any private educational institution it desires without limitation. We decline to engage in hypotheticals concerning what grants would not pass constitutional scrutiny.

and the economic prosperity of the State. In *Maready*, our Supreme Court held that, "[t]he expenditures [the statute at issue] authorizes should create a more stable local economy by providing displaced workers with continuing employment opportunities, attracting better paying and more highly skilled jobs, enlarging the tax base, and diversifying the economy." 342 N.C. at 724, 467 S.E.2d at 625. Session Law 2003-284 supports a very similar financial goal by increasing the diversity of our workforce and "permanently enhanc[ing] the infrastructure necessary to support long-term growth and prosperity." Session Law 2003-284. "Stimulation of the economy is an essential public and governmental purpose and the manner in which this purpose is to be accomplished is, within constitutional limits, exclusively a legislative decision . . . ." *Utilities Comm. v. Edmisten, Attorney General*, 294 N.C. 598, 610, 242 S.E.2d 862, 874 (1978).

Based on the foregoing, we hold that, in the present case, Session Law 2003-284 serves a "reasonable connection with the convenience and necessity of the [State,]" thereby satisfying the first prong of the *Madison Cablevision* test. *Madison Cablevision*, 325 N.C. at 646, 386 S.E.2d at 207. Truly, "[t]he people of North Carolina constitute our State's greatest resource." *Education Assistance Authority*, 276 N.C. at 587, 174 S.E.2d at 559. Not only does Session Law 2003-284 enhance educational opportunities for North Carolinians in fields of study that are unique to Johnson and Wales, there is also a correlation between this type of education and the stability of our State's economic infrastructure.

As to the second prong of the *Madison Cablevision* test, we further hold that Session Law 2003-284 benefits the public generally. Plaintiffs argue that the primary benefit is to Johnson and Wales and there is only an ancillary benefit to a few of the State's citizens who enroll in the university. This argument is without merit. "It is not necessary, in order that a use may be regarded as public, that it should be for the use and benefit of every citizen in the community." *Briggs*, 195 N.C. at 226, 141 S.E. at 599-600. "[A]n expenditure does not lose its public purpose merely because it involves a private actor. Generally, if an act will promote the welfare of a state or a local government and its citizens, it is for a public purpose." *Maready*, 342 N.C. at 724, 467 S.E.2d at 625; *see Peacock v. Shinn*, 139 N.C. App. 487, 495, 533 S.E.2d 842, 848 (stating, "a private party ultimately conducts activities which, while providing incidental private benefit, serve a primary public goal"), *appeal dismissed and disc. review denied*, 353 N.C. 267, 546 S.E.2d 110 (2000). Educating North Carolinians cer-

SAINE v. STATE

[210 N.C. App. 594 (2011)]

tainly promotes the welfare of our State, particularly at a time when unemployment is high and many jobs that have historically not required education beyond a high school diploma, or its equivalent, are rapidly disappearing. Additionally, our State economy relies heavily on the tourism industry.[7] Johnson and Wales provides education in the related fields of culinary arts and hospitality. It is only logical to presume that the State benefits from the increased knowledge and specialized skills of those working in this sector of our economy.

Clearly, this Court cannot project the total impact of the grant to Johnson and Wales on the State. That is not our task.

We look instead to whether the purpose of an act will promote the welfare of a state or a local government and its citizens, and do not engage in economic projections as to the potential monetary benefits resulting from the legislation. The latter analyses are for the General Assembly and the Executive Branch, which can also take into account non-monetary benefits.

*Blinson,* 186 N.C. App. at 341, 651 S.E.2d at 278 (internal citation and quotation marks omitted).

In sum, we hold that the two-prong test set out in *Madison Cablevision* has been satisfied and that Session Law 2003-284 serves a public purpose—providing funds to a private, non-profit university in order to assist in educating North Carolina citizens "[which] will permanently enhance the infrastructure necessary to support long-term growth and prosperity." As recognized supra, this Court is not bound to accept legislative "declarations" of the purpose behind this session law, *Maready,* 342 N.C. at 716, 467 S.E.2d at 620; however, we are persuaded that Session Law 2003-284 serves the public purpose set out by the General Assembly.

Regarding the other four session laws at issue, plaintiffs argue that, unlike Session Law 2003-284, the subsequent session laws did not state a purpose for their enactment nor did they set out any restrictions on how the funds could be used. Plaintiffs argue that the funds could be used at any Johnson and Wales satellite branch across the country and would, therefore, not assist any North Carolinian.

7. In its report *What Does Tourism Mean to North Carolina's Economy? The Economic Contribution of Tourism in North Carolina,* the North Carolina Department of Commerce boasts that travel and tourism generate "$20.2 billion a year in total economic demand in North Carolina" and that "this economic activity sustains 362,052 jobs," available at http://www.nccommerce.com/en/Tourism Services/PromoteTravelAndTourism Industry/TourismResearch/ (last visited 23 March 2011).

First, the General Assembly did not recite the detailed public purpose set out in Session Law 2003-284 in the latter four session laws. Plaintiffs have not cited a case, nor have we found one, that requires the General Assembly to set forth a written purpose in this type of legislation.[8] Just as legislation "cannot be saved by legislative declarations[,]" *id.*, the absence of a declaration does not automatically render the legislation unconstitutional. This Court must still examine the intent behind the legislation in order to determine whether it serves a public purpose. *See Blinson*, 186 N.C. App. at 340-41, 651 S.E.2d at 277-78 (setting out the task of the judiciary under the public purpose doctrine). In the instant case, the General Assembly provided its rational for giving funds to Johnson and Wales in Session Law 2003-284, which aids our appellate review and guides us in determining the intent behind the other four session laws. We have reviewed the four session laws at issue and hold that the intent of the legislature was to continue to provide financial assistance to Johnson and Wales and that the session laws serve a public purpose—to promote education and economic stability in the State.

Second, while plaintiffs claim that the money was unrestricted and *could* be used outside of North Carolina, plaintiffs did not make any such assertions in their complaint.[9] We are required to accept as true plaintiffs' allegations in their complaint, *Toomer*, 155 N.C. App. at 468, 574 S.E.2d at 83; however, plaintiffs' bare assertions on appeal that the money could possibly be going outside of North Carolina are insufficient to create a claim for relief. Moreover, the Committee Reports referenced by Session Laws 2007-323 and 2008-107 stated that the funds were to be paid "to Johnson and Wales University *in Charlotte*, a private university that specializes in the culinary and hospitality industries." (Emphasis added.) Clearly, the legislature intended for the funds to be used *in Charlotte*. If the State feels that Johnson and Wales is violating the terms of the session laws, then the State *may* have a claim against Johnson and Wales, but any such violation does not render the session laws themselves unconstitutional.

"In short, to put forth a claim for relief, plaintiffs were required to plead facts demonstrating that the motivation, aim, or intent of the . . . [l]egislation . . . was not a public one." *Blinson*, 186 N.C. App. at 341,

---

8. Still, we note that the better practice is to include the purpose in the legislation.

9. As stated *supra*, while the grant itself must be for a public purpose, the General Assembly is not required to place *any* restrictions on the funds it grants directly to an institution.

SAINE v. STATE

[210 N.C. App. 594 (2011)]

651 S.E.2d at 278. Plaintiffs in this case have failed to establish a claim upon which relief may be granted under the Public Purpose Clause. Consequently, we hold that the trial court properly granted defendants' motion to dismiss count two of plaintiffs' complaint pursuant to Rule 12(b)(6).

## II. Count One—Exclusive Emoluments

**[3]** In a closely related argument, plaintiffs claim that the funds provided to Johnson and Wales via the five sessions laws constitutes exclusive emoluments and are, therefore, unconstitutional. Article I, § 32 provides that "[n]o person or set of persons is entitled to exclusive or separate emoluments or privileges from the community but in consideration of public services." "An emolument is defined as '[t]he profit arising from office, employment, or labor; that which is received as a compensation for services, or which is annexed to the possession of office as salary, fees, and perquisites.' " *Crump v. Snead*, 134 N.C. App. 353, 356, 517 S.E.2d 384, 387 (quoting *Black's Law Dictionary* 524 (6th ed. 1990)), *disc. review denied*, 351 N.C. 101, 541 S.E.2d 143 (1999).

"[I]n determining whether a benefit has been afforded in violation of article I, § 32, a court must determine whether the benefit was given in consideration of public services, intended to promote the general public welfare, or whether the benefit was given for a private purpose, benefitting an individual or select group." *Peacock*, 139 N.C. App. at 496, 533 S.E.2d at 848. In *Peacock*, the Court determined that since a public purpose was achieved through the agreement at issue, it could not, therefore, be providing an exclusive emolument. *Id.*; *accord Blinson*, 186 N.C. App. at 342, 651 S.E.2d at 278. Consequently, in the case *sub judice*, since the session laws served a public purpose they were not providing exclusive emoluments and were, therefore, not unconstitutional on that ground. The trial court properly granted defendants' motion to dismiss count one of plaintiffs' complaint pursuant to Rule 12(b)(6).

## III. Count Three—Equal Protection

**[4]** Plaintiffs argue that the session laws at issue violated their rights to equal protection. Article I, § 19 of the North Carolina Constitution provides that "[n]o person shall be . . . deprived of his life, liberty, or property, but by the law of the land" or "denied the equal protection of the laws . . . ." Plaintiffs do not have standing to argue a violation of this constitutional provision. "[A] taxpayer has standing to bring an

action against appropriate government officials for the alleged misuse or misappropriation of public funds." *Goldston v. State*, 361 N.C. 26, 33, 637 S.E.2d 876, 881 (2006). " 'A taxpayer injuriously affected by a statute may generally attack its validity[;] [t]hus, he may attack a statute which . . . imposes on him in its enforcement an additional financial burden, however slight.' " *In re Appeal of Barbour*, 112 N.C. App. 368, 373, 436 S.E.2d 169, 173 (1993) (quoting *Stanley*, 284 N.C. at 29, 199 S.E.2d at 651). On the other hand, "[a] taxpayer, as such, does not have standing to attack the constitutionality of any and all legislation." *Nicholson v. State Education Assistance Authority*, 275 N.C. 439, 447, 168 S.E.2d 401, 406 (1969).

"If a person is attacking the statute on the basis that the statute is discriminatory, however, the person 'has no standing for that purpose unless he belongs to the class which is prejudiced by the statute.' " *Barbour*, 112 N.C. App. at 373, 436 S.E.2d at 173 (quoting *In re Appeal of Martin*, 286 N.C. 66, 75, 209 S.E.2d 766, 773 (1974)).

> Thus, the decisions of the Supreme Court and of this Court with respect to "taxpayer standing" differentiate between (1) actions challenging the constitutional validity of a statute on the grounds that it allows public funds to be dispersed for reasons other than a "public purpose," in which a taxpayer generally has standing, and (2) actions challenging the constitutional validity of a statute on the grounds that the statute discriminates among classes of persons, in which a taxpayer must show that he belongs to a class that receives prejudicial treatment.

*Munger v. State,* —— N.C. App. ——, ——, 689 S.E.2d 230, 236 (2010), *disc. review improvidently allowed,* —— N.C. ——, 705 S.E.2d 734 (2011).

In the present case, plaintiffs have failed to identify any class to which they belong which could be prejudiced by the session laws other than their status as taxpayers. Consequently, plaintiffs do not have standing to bring a constitutional challenge under Article 1, § 19 and the trial court properly dismissed count three pursuant to Rule 12(b)(1).

## IV. Count Four—Declaratory Judgment

Because plaintiffs' constitutional arguments have failed and their claims were correctly dismissed, they have no grounds to seek a declaratory judgment. The trial court did not err in dismissing count four pursuant to Rule 12(b)(6).

Conclusion

Based on the foregoing discussion, plaintiffs' constitutional challenges to the five session laws which allocated funds to Johnson and Wales are without merit. Consequently, we affirm the trial court's order.

Affirmed.

Chief Judge MARTIN and Judge THIGPEN concur.